# Illinois Official Reports

## Appellate Court

---

### *People v. Handy*, 2019 IL App (1st) 170213

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANTE HANDY, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-17-0213 |
| Filed<br>Rehearing denied | December 26, 2019<br>January 27, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 97-CR-11558; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Barry M. Lewis, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Annette Collins, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Justices Reyes and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant, Dante Handy, appeals the judgment of the circuit court denying him leave to file a successive postconviction petition, arguing that he has met the "cause and prejudice" test. In 1998, he received a discretionary sentence of four consecutive 30-year prison terms for crimes he committed when he was 18½ years old. Thereafter, a portion of the sentencing code was ruled a violation of the single subject rule, and defendant's 102-year real time prison term (*i.e.*, 85% of his 120-year sentence, until he was 120½ years old) was subsequently converted to a 60-year real time term, whereby he would become eligible for mandatory supervised release at age 78½ years.

¶ 2 On appeal, defendant argues that his sentence is unconstitutional as applied to him under the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). He contends that his sentence is a *de facto* life sentence, such sentences are categorically barred as unconstitutional with respect to minors, and Illinois courts have recognized that there is no fine demarcation between offenders just under the age of 18 years and those just over it. He also argues that he has shown rehabilitative potential and this cause should be sent to the trial court for resentencing.

¶ 3 For the reasons that follow, we hold that defendant did not establish prejudice for leave to file his successive postconviction petition because he was an adult at the time he committed and significantly participated in the offenses of armed robbery, home invasion, residential burglary, aggravated battery of a senior citizen, kidnapping, aggravated criminal sexual assault, and possession of a stolen motor vehicle. Also, the trial court properly considered relevant factors concerning defendant before imposing his discretionary sentence. Accordingly, we affirm the judgment of the circuit court.[1]

¶ 4 **I. BACKGROUND**

¶ 5 Following a 1998 jury trial, defendant was found guilty of three counts of aggravated criminal sexual assault, aggravated kidnapping, home invasion, two counts of armed robbery, aggravated battery of a senior citizen, residential burglary, and possession of a stolen motor vehicle. At the trial, the State's evidence showed that on February 23, 1997, defendant and three codefendants, all carrying firearms, invaded the home of a family at about 4 a.m. Defendant and the codefendants robbed, threatened and hit family members at gunpoint, and kidnapped and repeatedly sexually assaulted a 15-year-old girl.

¶ 6 Specifically, the victim, Mr. W., was sitting in his van, which was parked in his driveway, and waiting for the vehicle's engine to warm up. His family was inside the house sleeping. Defendant and the three codefendants surrounded Mr. W.'s van, ordered him out of the van at gunpoint, and robbed him of about $7 and cigarettes. All four offenders ordered him to open the garage attached to his house, forced him into the house, and followed him inside. All four offenders had their guns pointed at Mr. W.'s head as they followed him down the hallway where the bedrooms were located. Mr. W.'s 74-year-old mother, Mrs. W., was asleep in her room with his twin 6-year-old daughters. Mr. W. turned on the light and told Mrs. W. to wake

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

up. Defendant held a gun to Mr. W.'s head and forced him to initially kneel and eventually lie down on the hallway floor, facing a corner and with his hands on his head. The offenders cursed at the twins, threatened to kill Mr. W., and continually repeated gang slogans. While defendant held a gun to the back of Mr. W.'s head, codefendant Sammy Lowery robbed Mrs. W. of about $12.

¶ 7    Then defendant and another codefendant busted into the bedroom of Mr. W.'s 15-year-old daughter. Defendant accused her of being on the phone, and the other codefendant snatched her off her bed and brought her to the hallway. Lowery grabbed her and took her into Mr. W.'s bedroom while defendant returned to the hallway and held his gun to the back of Mr. W.'s head. Lowery took off the teen victim's pajama shorts and underwear, told her to "suck his d***," and exposed his penis. Mrs. W. forced her way into the bedroom and tried to stop Lowery by pulling his hands and arms, but Lowery swung at Mrs. W. and threw her off him, causing her to hit the walls, door, and furniture. Mrs. W. continued to struggle with Lowery, who struck her and knocked her down, fracturing her finger and bruising her shoulder.

¶ 8    Mrs. W. refused to stop fighting, so Lowery took the teen victim back to her own bedroom and attempted to sexually assault her there. Mrs. W. followed them and continued to struggle with Lowery as he dragged her granddaughter to the kitchen. By now, Mr. W. was also in the kitchen area, near the garage door, and defendant continued to hold a gun to Mr. W.'s head. Defendant told Mrs. W., "I should kill your motherf*** son." Meanwhile, the two other codefendants were taking items, like a video cassette recorder (VCR) and television, from the house. Lowery dragged the teen victim to the den, but he went back into the kitchen because Mrs. W. continued to pull him away from her granddaughter. Defendant and the two other codefendants were yelling to go, but Lowery insisted that they had "to take the b*** with" them. Lowery yanked the kitchen phone from the wall and told the family not to call the police. While defendant held his gun to Mr. W.'s head, the other two codefendants left the house and Lowery went back into the den, grabbed the teen victim by her arm, and pulled her from the house while Mrs. W. held her granddaughter's other arm and tried to pull her back. Mr. W. felt defendant remove his gun from against Mr. W.'s head and then heard the door close and Mrs. W. yelling outside. While Lowery pulled the teen victim toward her father's van, Lowery struck Mrs. W. with his hand that was holding his gun, causing Mrs. W. to fall down in the snow. By the time Lowery pulled the teen victim into the van, defendant and the two other codefendants were already in the van. Lowery pushed the teen victim to the back seat of the van, and the van doors closed.

¶ 9    While one codefendant drove the van away from the house, defendant and the other codefendant went to the back of the van where Lowery had begun raping the teen victim. During the kidnapping, the four offenders repeatedly and violently took turns sexually assaulting the victim, often two at a time. At one point, Lowery penetrated her vagina with his penis, and defendant put his penis in her mouth. Then defendant argued with Lowery because defendant wanted to get on top of the victim. Defendant kept saying, "I want some too." So, Lowery and defendant switched places, and defendant put his penis in the victim's vagina while Lowery put his penis in her mouth. Defendant screamed, moaned, and said that he was "coming." Then defendant drove the van while the codefendants continued gang raping the victim.

¶ 10    The victim could not recall exactly how many times each of the four offenders sexually assaulted her, saying, "It was too many times." At one point, defendant told Lowery to put the

victim out of the van. When Lowery refused, defendant threatened to shoot the victim and pointed his gun at her back. The whole time in the van, the offenders were yelling "GD" and "BD." They argued amongst themselves, each one telling the others to let him "get to" the victim. They also talked about smoking marijuana when they were done and kept saying to each other to "take her to 69th and Green." Lowery even asked the victim several times if she wanted to be his girlfriend. When the van stopped, all four offenders exited the van. The victim tried unsuccessfully to start the van. She retreated to the back of the van before Lowery and another codefendant got back in the van. While the codefendant drove, Lowery sexually assaulted the victim again. When the codefendant stopped the van, he threatened to kill the victim's family if she told anyone what had happened and gave her directions to the expressway. The codefendant and Lowery exited the van, and the victim drove home.

¶ 11        At about 5 a.m., defendant's neighbor was returning home to her apartment, which was across the hall from defendant's apartment, when defendant ran up the stairs behind her, carrying a revolver. She asked him a question, but he just went inside his apartment and slammed the door closed. When she questioned his behavior, he cursed at her through the door. The three codefendants arrived shortly thereafter, visibly carrying their guns. One of the codefendants brought a television, and Lowery's penis was sticking out of his pants. The neighbor heard defendant say that he had never done anything like this before and was going to kill himself.

¶ 12        Defendant was arrested in Texas on March 13, 1997, and brought back to Chicago. He agreed to have his statement to the police reduced to a written summary. According to that summary, defendant was drinking, smoking marijuana, and driving around with the three codefendants. The codefendants forced Mr. W. out of his van at gunpoint and into his house. Defendant followed them inside and held a codefendant's gun on Mr. W. while the codefendants robbed, threatened, and attacked the family. Defendant wanted to leave and eventually entered the van and honked the horn to summon the three codefendants. The three codefendants got in the van with the loot and teenage victim, and defendant drove off. Defendant described in graphic detail how the codefendants raped the victim, in what manner, how many times, and what they said as they did so. Then, one codefendant took over driving the van and another codefendant told defendant to "go back there and get you some." Defendant went to the back of the van and, while no one else was on the victim, penetrated her vagina with his penis. But then, when Lowery came over and put his penis in the victim's mouth, defendant pulled his penis out of the victim. Defendant resumed driving the van while the codefendants continued to gang rape the victim. Eventually, defendant parked the van and said, "F*** this, I'm out of here." When the codefendants said that they should kill the victim, defendant told them to just let her go. When defendant left the group, he ran home and told his girlfriend what happened. A few days later, he took a plane to Texas because he was afraid of being caught by the police.

¶ 13        Defendant testified at the trial and denied ever sexually assaulting the victim. He asserted that he did not know that the codefendants had planned a robbery until it happened, he did not intend to kidnap anyone, he did not have a gun, and someone else held a gun to Mr. W.'s head. According to defendant, he merely stood in the house while the codefendants attacked and robbed the family. Defendant was ready to leave because he did not "want things to go that far as they were going" and "they [were] getting out of hand." He claimed that he left the house

first, got in the driver's seat of the van, and drove away once the codefendants entered the van with the teen victim, who was wearing a nightgown.

¶ 14    After defendant drove about two blocks, he heard a noise in the back of the van. He stopped the van in the middle of the street and noticed that the teen victim was naked and being raped. Defendant told Lowery to "put the girl out," but Lowery ordered him to keep driving. Defendant continued driving and did not hear any more noise. Defendant struck a few parked cars while driving, so Lowery ordered another codefendant to drive. While defendant sat in the front passenger seat, he noticed that Lowery was raping the victim in the back of the van. Defendant felt nervous, scared, and helpless to do anything. The victim "cried for a minute because things started getting out of hand," and a "simple *** robbery *** got carried away to [where] somebody was kidnapped." Defendant did not want "things" to go that far and "was scared all the time" about what they would be "getting" if they "got caught." When the van stopped, defendant got out and ran to his apartment. The codefendants told defendant, who at the time was in the "opposite gang and living in their territory," to keep his mouth closed. Defendant was afraid that the codefendants would harm his girlfriend or his two-year-old daughter.

¶ 15    Defendant testified that the detective who questioned him threatened him, shoved him back against the mirror in the interrogation room, and pulled his braids. When defendant refused to answer the questions of the assistant state's attorney and requested a lawyer, the detective told defendant he would not get a lawyer until he answered the questions. Defendant felt nervous when the assistant state's attorney told him about the potential penalty he was facing.

¶ 16    At the sentencing hearing, the court considered defendant's postsentencing investigation report, which indicated that his birthday was August 17, 1978. Defendant reported that his childhood was easy, his mother took good care of him, and no one in his immediate family had any substance abuse problems. Although he did not have a relationship with his father, he was close to his adopted brother. Defendant had one child and was a former gang member, and his criminal background included two juvenile adjudications, for which he served unsatisfactory probation terms, and an adult conviction for unlawful use of a weapon, for which he received 18 months' probation that he was serving at the time of the offense in this case. He received "B" and "C" grades in high school and completed the tenth grade but dropped out due to gang problems at the school. He was treated in 1997 for a head injury incurred following a gang "violation" beating but reported his health as "cool." Regarding the offense at issue here, defendant stated that he made a mistake, chose to hang around with the wrong people, and wished that he could have a chance to prove to society that he was not the criminal "they" portrayed him to be.

¶ 17    In aggravation, Mrs. W. described the continuing effects of the brutal attack on her family. She described the trauma defendant inflicted on her son, Mr. W., when defendant held him at gunpoint and rendered him helpless while the codefendant's attacked his family. The State sought the maximum 120-year sentence for each offender and recounted the senseless and brutal nature of the crimes committed by all four defendants. The State argued that the defendants lacked any rehabilitative potential and had slept, laughed, or joked during the court proceedings as if this matter was no big deal.

¶ 18    In mitigation, counsel argued that defendant was less culpable than the codefendants and showed remorse after the crime when he said that he wanted to kill himself. Counsel argued that Lowery planned the crime and drove it forward, whereas defendant participated in the

sexual assault so briefly that the codefendants mocked him. Counsel also asserted that defendant's demeanor during the proceedings was attentive, appropriate, and "animated." Counsel urged the court not to impose the maximum sentence on defendant because he could be rehabilitated and make some contribution as a mature or middle-aged person.

¶ 19    In allocution, defendant said that he was sorry for "what happened to" the W. family and felt "real bad" something like this "happened to" them. He would take it back if he could and did not know things were going to go so far. He "just made a poor decision" and asked for the court's mercy so that he could show society that he can be a better person when he is released from prison.

¶ 20    The trial court imposed on defendant the maximum sentence of four consecutive prison terms of 30 years each for home invasion and three counts of aggravated criminal sexual assault, for a total of 120 years' imprisonment. Defendant's codefendants received the same sentence. On appeal, defendant argued, *inter alia*, that his sentence was excessive because the court was improperly influenced by the media attention and failed to consider his rehabilitative potential based on his "individual circumstances," which included the absence of an extensive criminal history, beatings and ridicule from gang members, and his showing of remorse at sentencing. This court affirmed the circuit court's judgment on direct appeal. *People v. Handy*, 328 Ill. App. 3d 1087 (2002) (table) (unpublished order under Illinois Supreme Court Rule 23). Ultimately, however, defendant's sentence was converted to 60 years in prison before he would become eligible for mandatory supervised release at age 78½ years; this conversion was due to a portion of the sentencing code being ruled in violation of the single subject rule.

¶ 21    In his 2003 postconviction petition, defendant argued, *inter alia*, that appellate counsel failed to argue that his sentence was disproportionate and excessive in light of his young age, lack of a criminal history, and rehabilitative potential. This court affirmed the circuit court's summary dismissal of defendant's 2003 postconviction petition. *People v. Handy*, 349 Ill. App. 3d 1036 (2004) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 22    In 2011, defendant moved the circuit court for leave to file a successive postconviction petition, which argued, *inter alia*, that he was deprived of due process because the truth-in-sentencing law under which his sentence was imposed was an unconstitutional statutory scheme. This court affirmed the circuit court's denial of leave to file a successive postconviction petition. *People v. Handy*, 2012 IL App (1st) 111067-U.

¶ 23    In November 2016, defendant moved the circuit court to file the successive postconviction petition at issue in this appeal. His *pro se* petition argued that his 60-year prison sentence was unconstitutional as applied to him under the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Specifically, he argued that his sentence constitutes a *de facto* life sentence without the possibility of parole and the trial court failed to consider the special circumstances of his youth. Regarding the "cause and prejudice" test to obtain leave to file his successive petition, he argued that (1) the law concerning the imposition of lengthy sentences on juveniles changed substantially after his initial 2003 postconviction petition due to the recent decisions of *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), *Miller v. Alabama*, 567 U.S. 460 (2012), *Graham v. Florida*, 560 U.S. 48 (2010), and *People v. Davis*, 2014 IL 115595, and (2) there was a reasonable probability that he would have received a shorter sentence if the trial court had correctly understood and applied the eighth amendment of the United States Constitution at his sentencing hearing.

¶ 24　　　On December 7, 2016, the circuit court denied defendant leave to file a successive postconviction petition, and defendant timely appealed.

¶ 25　　　　　　　　　　　　　　II. ANALYSIS

¶ 26　　　The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred at trial. *People v. Eddmonds*, 143 Ill. 2d 501, 510 (1991). The Act contemplates the filing of only one postconviction petition (*People v. Flores*, 153 Ill. 2d 264, 273 (1992)), providing that any claim not raised in the original or amended petition is subject to the doctrines of *res judicata* and waiver (725 ILCS 5/122-3 (West 2016); *People v. Smith*, 341 Ill. App. 3d 530, 535 (2003)). However, the filing of a successive postconviction petition may be allowed where the proceedings on the initial petition were fundamentally deficient. *Flores*, 153 Ill. 2d at 273-74. Specifically, the waiver provision can be lifted, and a successive petition can be considered on the merits if it either meets the cause and prejudice test of section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2016)) or its consideration is necessary to prevent a fundamental miscarriage of justice because the defendant shows a claim of actual innocence (*People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)).

¶ 27　　　A defendant seeking to file a successive postconviction petition must first obtain leave of court. *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010). Here, defendant seeks leave to file his successive postconviction petition under the cause and prejudice test of section 122-1(f) of the Act, which provides:

> "Only one petition may be filed by a petitioner under this Article without leave of the court. Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2016).

We review *de novo* the denial of a defendant's motion for leave to file a successive postconviction petition (*People v. Wrice*, 2012 IL 111860, ¶ 50) and may affirm the denial on any ground of record (*People v. Johnson*, 208 Ill. 2d 118, 129 (2003)).

¶ 28　　　A defendant's motion for leave to file a successive postconviction petition satisfies the section 122-1(f) cause and prejudice requirement if the motion adequately alleges facts demonstrating cause and prejudice. *People v. Smith*, 2014 IL 115946, ¶ 34. Moreover, the cause and prejudice test for successive petitions involves a higher standard than the frivolous or patently without merit standard applied to first-stage postconviction petitions. *Id.* ¶ 35. A defendant seeking leave to file a successive petition must submit enough in the way of pleadings and documentation to allow a circuit court to make an independent determination on the legal question of whether adequate facts have been alleged for a *prima facie* showing of cause and prejudice. *Id.*

¶ 29　　　If a defendant fails to adequately allege cause and prejudice, the circuit court does not reach the merits of his successive petition because the cause and prejudice test is a procedural prerequisite to obtaining that review. *People v. Welch*, 392 Ill. App. 3d 948, 955 (2009).

"If the court determines that cause and prejudice have been adequately alleged and allows the petition to be filed, it advances to the three-stage process for evaluating postconviction petitions. During this process, the State would have an opportunity to seek dismissal of the petition on any grounds, including the defendant's failure to prove cause and prejudice for not having raised the claims in the initial postconviction petition." *People v. Bailey*, 2017 IL 121450, ¶ 26.

¶ 30 Our supreme court has held that

"leave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35.

¶ 31 Defendant asserts that he made the requisite showings of (1) cause, because the new constitutional rule of *Miller*, 567 U.S. 460, applies retroactively to his sentence, and (2) prejudice, because a *de facto* life sentence for a youth in any case other than homicide is categorically barred under *Graham*, 560 U.S. 48. Specifically, defendant argues that his sentence should be vacated and the matter remanded for resentencing because the categorical bar to the imposition of life sentences without the possibility of parole on juveniles, as established in *Graham*, logically should be extended to someone like him, who was only 18½ years old at the time of the offense. He argues that his 60-year real time sentence is a *de facto* life sentence and Illinois courts have recognized that no clear line of demarcation has been drawn between offenders just under 18 years of age and those just over it.

¶ 32 Defendant also argues that he showed rehabilitative potential by expressing remorse and acknowledging that he had associated himself with very bad, remorseless individuals. He contends that he should not have been sentenced identically to his three codefendants because he was younger than them and the victim's testimony described defendant committing just one vaginal sex act and one oral sex act in contrast to the multiple sex acts committed by the three codefendants, who ridiculed defendant for participating in the sexual assault for only a couple of minutes. Moreover, defendant was beaten by his former gang for a "violation," and his youth and experience may have left him unable to resist the pressure of the three codefendants or of the gangs themselves.

¶ 33 According to defendant, it is not necessary to have further hearings directly on his successive postconviction petition because the appropriate sentence should be determined by the trial court after a full hearing in aggravation and mitigation. Defendant asserts that his sentencing hearing did not comport with *Miller* because the trial court's sentencing order and comments did not indicate that the court considered the mitigating evidence before it and determined whether he was either a youthful offender whose crime reflected unfortunate yet transient immaturity or the rare juvenile offender whose crime reflected irreparable corruption.

¶ 34 We first address defendant's eighth amendment claim. The eighth amendment prohibits "cruel and unusual punishments" and applies to the states through the fourteenth amendment. U.S. Const., amends. VIII, XIV; *Davis*, 2014 IL 115595, ¶ 18. The United States Supreme Court has held that the eighth amendment prohibits capital sentences for juveniles who commit murder (*Roper v. Simmons*, 543 U.S. 551, 578-79 (2005)), mandatory life sentences for juveniles who commit nonhomicide offenses (*Graham*, 560 U.S. at 82), and mandatory life sentences for juveniles who commit murder (*Miller*, 567 U.S. at 489). *People v. Buffer*, 2019

IL 122327, ¶ 16. In *Miller,* 567 U.S. at 471, the Supreme Court stated that "children are constitutionally different from adults for purposes of sentencing." The lack of maturity and underdeveloped sense of responsibility of children leads to "recklessness, impulsivity, and heedless risk-taking." *Id.* Children are also more vulnerable to negative influences and outside pressures, have limited control over their own environment, and "lack the ability to extricate themselves from horrific, crime-producing settings." *Id.* Their character is not as well formed as an adult's, their traits are "less fixed," and their actions are "less likely to be evidence of irretrievabl[e] deprav[ity]." (Internal quotation marks omitted.) *Id. Miller* requires sentencing courts in homicide cases to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. In *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736, the Supreme Court found that *Miller* applies retroactively.

¶ 35       The Illinois Supreme Court interpreted *Miller* to apply to discretionary life sentences, finding that "[l]ife sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." *People v. Holman*, 2017 IL 120655, ¶ 40. Before a trial court may sentence a juvenile defendant to life without parole, the court must consider several factors, including his age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; his family and home environment; his degree of participation in the homicide; and his prospects for rehabilitation. *Id.* ¶ 46.

¶ 36       In *People v. Harris*, 2018 IL 121932, the 18-year-old defendant on direct appeal argued, *inter alia*, that his mandatory minimum aggregate term of 76 years' imprisonment violated the proportionate penalties clause, noting that he had no prior criminal history and several other attributes that reflected his rehabilitative potential. Our supreme court found that *Miller* did not directly apply to the defendant because he was an adult. *Id.* ¶ 45. Moreover, his challenge was premature because the record did not "contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision" applied to the defendant's specific facts and circumstances. *Id.* ¶ 46. The supreme court stated that the record needed to be developed and defendant's claim was more appropriate for another proceeding, such as a proceeding under the Act. *Id.* ¶ 48. In *Buffer*, 2019 IL 122327, ¶ 41, our supreme court held that, for purposes of juvenile offenders, a *de facto* life term is any sentence over 40 years.

¶ 37       Here, defendant acknowledges that, at 18½ years old, he was not technically a juvenile at the time of his offense. Nevertheless, he argues that the eighth amendment protection afforded to juveniles under *Miller* should be extended to him. In Illinois, *Miller*'s eighth amendment protection applies only to juveniles; natural life sentences for young adults have not been found to violate the eighth amendment. For purposes of challenging life sentences without parole, "the [Supreme] Court drew a line at the age of 18 years," however arbitrary that line may be. *People v. Herring*, 2018 IL App (1st) 152067, ¶ 103 (citing *Roper*, 543 U.S. at 574); see also *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 47 (*Miller* does not apply to a life sentence imposed on someone who was at least 18 at the time of the offense and so the defendant did not show prejudice from omitting his eighth amendment claim from his initial postconviction petition); *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 31 ("*Miller* protections under the eighth amendment are not implicated in cases of adult offenders"); *People v. Thomas*, 2017 IL

App (1st) 142557, ¶ 28 (sentence for an adult defendant "that approaches the span of the defendant's lifetime" does not implicate the eighth amendment). Defendant's eighth amendment challenge to his 60-year real time sentence fails.

¶ 38　　Next, defendant asserts that his sentence violates the proportionate penalties clause of the Illinois Constitution, which provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. We assume that the proportionate penalties claim is not automatically defeated by the failure of defendant's eighth amendment claim. See *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 51-53 (noting inconsistency about whether the eighth amendment and proportionate penalties clause are coextensive and should be interpreted in "lockstep"). Defendant seeks to extend the reasoning in *Miller* to young adults under the proportionate penalties clause.

¶ 39　　In *People v. House*, 2019 IL App (1st) 110580-B, the 19-year-old defendant, who had been found guilty of first degree murder and aggravated kidnapping, appealed the second-stage dismissal of his postconviction petition, contending in part that his mandatory natural life sentence violated the proportionate penalties clause. After considering the effect of *Harris*, this court concluded that the defendant was entitled to a new sentencing hearing because his mandatory natural life sentence violated the proportionate penalties clause based on his age, family background, his actions as a mere lookout, and the lack of any prior violent convictions. *Id.* ¶ 32. Specifically, the defendant's "young age of 19 [was] relevant under the circumstances" and his sentence "involved the convergence of the accountability statute and the mandatory natural life sentence." *Id.* ¶ 46. *House* also found it somewhat arbitrary that the age of 18 designates that someone is a mature adult and discussed recent research and articles that explain the differences between young adults and a fully mature adult. *Id.* ¶ 55. Moreover, recent trends indicated that defendants under 21 years old "should receive consideration for their age and maturity level when receiving harsh sentences." *Id.* ¶ 62. *House* noted the particular considerations at play in the defendant's case: he "was barely a legal adult and still a teenager" when he committed the offenses; he did not have a history of committing violent crimes; he attended high school through twelfth grade but did not graduate; and he never knew his father, his mother died when he was 18, and he was raised by his maternal grandmother. *Id.* ¶ 63. The court added that the defendant's youthfulness was relevant when considered with his participation in the crimes, in which he acted as a lookout as opposed to being the actual shooter. *Id.* ¶¶ 63-64. The court was also troubled by the sentencing court's inability to consider the goal of rehabilitation due to the mandatory nature of the defendant's sentence. *Id.* ¶ 64.

¶ 40　　*House* extended *Miller* principles to young adults under the proportionate penalties clause based on special circumstances that are not present in defendant's case. A key factor in *House* was that the defendant "merely acted as a lookout" and was not present at the scene of the murder. *Id.* ¶ 46. The defendant was serving the same sentence that applied to someone who actually participated in the shootings, while another codefendant with similar culpability as the defendant had been released following resentencing because that codefendant was 17 years old during the offense. *Id.* Whether a defendant physically committed the offense is a significant consideration for courts tasked with deciding whether to extend *Miller* principles to a young adult under the proportionate penalties clause. See *Pittman*, 2018 IL App (1st) 152030, ¶ 38 (not extending *Miller* principles where the 18-year-old defendant was the perpetrator of the

violent stabbing deaths of three victims); *Thomas*, 2017 IL App (1st) 142557, ¶ 34 (not extending *Miller* principles where the 18-year-old defendant was the shooter and his convictions were based on his own actions instead of accountability for the acts of another); *People v. Ybarra*, 2016 IL App (1st) 142407, ¶ 27 (not extending *Miller* principles where the 20-year-old defendant was the one who "pulled the trigger"). Here, we cannot overlook defendant's active participation where he invaded the victims' house with the codefendants, held a gun to Mr. W.'s head to prevent him from interfering while the codefendants robbed and attacked his family and kidnapped his young daughter, and then actively participated in the gang rape.

¶ 41    Another significant consideration in *House* was that the sentencing court could not consider any mitigating factors because of the mandatory nature of the defendant's sentence. *House*, 2019 IL App (1st) 110580-B, ¶ 64. Here, defendant's sentence was discretionary, which allowed the sentencing court to consider many different factors in determining a sentence. The court reviewed defendant's presentence investigation report, which included the details of his age, family background, and education. Furthermore, defense counsel argued that defendant was not as culpable as his codefendants, had expressed remorse, and showed potential for rehabilitation. The sentencing court considered the mitigating evidence that defendant claims it ignored, and this court previously found on direct appeal that his sentence was not excessive and the trial court properly considered his rehabilitation potential. Because defendant was an adult, an active participant in the crimes, and received a discretionary sentence, he is not entitled to a new hearing for a more in-depth consideration of his youth under *House*.

¶ 42    We are bound by existing precedent. *In re Clifton R.*, 368 Ill. App. 3d 438, 440 (2006) (the appellate court is bound to follow decisions of the Illinois Supreme Court); *People v. Jones*, 357 Ill. App. 3d 684, 694 (2005) (the legislature's function and role is to declare and define criminal offenses and determine the nature and extent of punishment for their commission). Defendant urges this court to apply the analysis used for a juvenile offender in *Miller* to him, an 18½-year-old adult at the time of his offenses. We recognize that defendant is serving a harsh sentence, but he has not shown prejudice and the trial court properly denied him leave to file his successive postconviction petition.

¶ 43                                III. CONCLUSION

¶ 44    For the foregoing reasons, we affirm the judgment of the circuit court denying defendant leave to file a successive postconviction petition.

¶ 45    Affirmed.