2021 IL App (1st) 180297-U

FIRST DISTRICT,
FIRST DIVISION
February 1, 2021

No. 1-18-0297

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CR 11194 |
| | ) | |
| BRIAN THOMPSON, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justice Pierce concurred in the judgment.
Justice Hyman dissented.

**ORDER**

¶ 1    *Held*:   Following his conviction for murder and attempted murder that he committed at the age of 19, defendant filed a postconviction petition in which he argued that his discretionary *de facto* life sentence was unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012), and the proportionate penalties clause. We affirm the first-stage dismissal of his petition, finding that it failed to state the gist of a legally cognizable claim and that his original sentencing hearing was *Miller*-compliant.

¶ 2    After opening fire on a crowded street in a residential neighborhood, defendant Brian Thompson was convicted of first-degree murder and attempted first-degree murder and

sentenced to 60 years' imprisonment. He filed a postconviction petition claiming that because he was 19 when he committed the shooting, his sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) in light of the principles articulated in *Miller v. Alabama*, 567 U.S. 460 (2012). The trial court dismissed his petition at the first stage of postconviction proceedings, finding that *Miller* and the constitutional sentencing protections applicable to juvenile offenders did not apply to adult offenders such as Thompson. For the reasons that follow, we affirm.

¶ 3                                          BACKGROUND

¶ 4        We set out the facts of Thompson's offense in detail in our opinion disposing of his direct appeal. See *People v. Thompson*, 2016 IL App (1st) 133648, ¶¶ 10-23. Most of those facts are unnecessary for an understanding of the issue raised in this appeal, so we summarize them briefly.

¶ 5        In 2010, Thompson and his codefendant pulled up to 1927 South St. Louis Avenue in a car, disembarked, and started shooting. Daniel Crockett, Jr., was fatally shot; Joshua Evans was shot in the leg and survived. Evans recognized the men in the car from the neighborhood and identified Thompson as one of the shooters. Crockett's mother and brother also identified Thompson as one of the shooters. A jury found Thompson guilty of the first-degree murder of Crockett and the attempted first-degree murder of Evans.

¶ 6        At sentencing, the State emphasized that Thompson and his codefendant "pulled up to a residential block, got out of a car, and basically opened fire on a street filled with people." The State further argued: "To drive up to a street filled with people in the middle of the day and open fire with several guns is something that cannot be tolerated in a civilized society."

¶ 7      Thompson's counsel argued that the minimum sentence was appropriate based on Thompson's young age and his "insignificant criminal record" with no felony convictions. Counsel noted that he had been able to obtain a degree in jail and cited several letters written in Thompson's support that described him as "a liked, happy, good-hearted kid."

¶ 8      Thompson's presentence investigation (PSI) report indicated that he had a "normal" childhood, with no abuse and no family history of criminality or gang affiliation. Thompson himself had no gang affiliation and had never experimented with alcohol or illicit drugs. He also had no history of mental illness, past or present. He attended public school until tenth grade, when he was expelled for excessive absenteeism; he had no further educational goals and had never been employed. Prior to his incarceration, he was financially supported by his mother.

¶ 9      Under these facts, the trial court found the minimum sentence inappropriate, stating that Thompson was shooting on a "crowded street" where "other people could have been shot as well." Although the court acknowledged Thompson's age and lack of criminal history as mitigating factors, it found those factors were outweighed by his "horrendous decision [with] horrific consequences." The court therefore sentenced Thompson to consecutive sentences of 38 years for first-degree murder (above the minimum of 35 years) and 22 years for attempted murder (above the minimum of 21 years), for a total of 60 years.

¶ 10     On direct appeal, we affirmed Thompson's convictions and sentence, with a modification of presentence custody credit. *Thompson*, 2016 IL App (1st) 133648.

¶ 11     On July 13, 2017, Thompson filed a *pro se* postconviction petition raising several claims. First, he claimed his trial counsel was ineffective for failing to investigate eyewitnesses to the shooting, even though "a lot of people" were present. Second, he raised actual innocence and

*Brady* claims based on alleged eyewitness statements to police. (He does not pursue these claims on appeal.)

¶ 12     Lastly, he argued that his 60-year sentence for a shooting he committed at the age of 19 constituted an unconstitutional *de facto* life sentence. He stated that he would not become eligible for release until 2070, a date beyond his statistical life expectancy. *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26 (citing statistics indicating that "a person held in a general prison population has a life expectancy of about 64 years"). He further argued that "the 'science and social science' evidence in which the United States Supreme Court rested their decisions on in *Miller v. Alabama*, *Graham v. Florida*, and *Roper v. Simmons* regarding 'adolescent brain development' should apply to young adults 18 to 24 years of age with equal force." He argued that such offenders should be evaluated on a case-by-case basis, taking into account their circumstances, degree of maturity, and "adolescent brain deficiencies" to determine their potential for rehabilitation.

¶ 13     Thompson therefore asserted that his sentence was unconstitutional. He requested appointment of a neurologist, a psychologist, and a "mitigation expert" to evaluate his mental age, his maturity level, and his "home, school, education, and attendant characteristic lifestyle at the time of the offense," all of which he argued might reduce his culpability.

¶ 14     The circuit court dismissed Thompson's petition at the first stage of postconviction proceedings, finding that it failed as a matter of law because *Miller*'s protections did not apply to adult offenders like Thompson. Thompson now appeals.

¶ 15                                             ANALYSIS

¶ 16     The Post-Conviction Hearing Act allows a convicted defendant to challenge his conviction as a substantial denial of his rights under either the United States or Illinois

Constitutions. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). At the first stage of postconviction proceedings, the trial court independently considers the petition and dismisses it if it "is frivolous or is patently without merit" (725 ILCS 5/122-2.1 (West 2016)). The threshold for survival at this stage is low, and a petitioner need only present a limited amount of detail regarding his claims. *Hodges*, 234 Ill. 2d at 9. We accept all well-pled allegations as true, except those positively rebutted by the record. *People v. Knapp*, 2019 IL App (2d) 160162, ¶ 37; see *People v. Phyfiher*, 361 Ill. App. 3d 881, 885 (2005) (petitioner's allegations substantively rebutted by record were frivolous and patently without merit). We review the first-stage dismissal of a postconviction petition *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 17        Thompson's sole argument in this appeal is that his 60-year sentence violates the proportionate penalties clause of the Illinois Constitution, which requires that "all penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Under this provision, the application of a sentencing statute is unconstitutional when it "is shocking to the moral sense of the community," based upon an " 'evolving standard[] of decency that mark[s] the progress of a maturing society.' " *People v. Miller*, 202 Ill. 2d 328, 339-40 (2002) (*Leon Miller*) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

¶ 18        As part of this evolving standard of decency, the Supreme Court in *Miller*, 567 U.S. at 471, found that juveniles are "constitutionally different from adults" for sentencing purposes because they have "diminished culpability and greater prospects for reform." The Court identified three significant ways in which juveniles differ from adults:

"First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children

are more vulnerable *** to negative influences and outside pressures, including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity]." (Internal quotation marks omitted.) *Id.* (citing *Roper v. Simmons*, 543 U.S. 551, 569 (2005)).

Thus, under *Miller*, a juvenile offender may not be sentenced to mandatory life in prison without possibility of parole. *Id.* at 479. Moreover, a juvenile offender may not be given a discretionary life sentence without consideration of "the defendant's youth and its attendant characteristics." *People v. Holman*, 2017 IL 120655, ¶ 40.

¶ 19        Our supreme court has made clear that the foregoing eighth amendment protections apply only to juveniles and not to young adults like Thompson. *People v. Harris*, 2018 IL 121932, ¶ 61 (rejecting defendant's *Miller* claim because "for sentencing purposes, the age of 18 marks the present line between juveniles and adults. As an 18-year-old, defendant falls on the adult side of that line."). However, the proportionate penalties clause is not determined in lockstep with the eighth amendment but may provide additional limitations on penalties. *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 69. Thompson argues that, under the proportionate penalties clause, we should extend the reasoning of *Miller* to him based on an "advancing scientific consensus that a person's brain is not fully developed until their mid-twenties."

¶ 20        We disagree. Assuming that Thompson's 60-year sentence is a *de facto* life sentence (see *People v. Buffer*, 2019 IL 122327, ¶ 42 (sentence "greater than 40 years" is a *de facto* life sentence for a juvenile)), we find for two reasons that Thompson's claim is frivolous and patently without merit.

¶ 21      First, and most significantly, we do not find that Thompson's sentence "shock[s] the moral sense of the community" (*Leon Miller*, 202 Ill. 2d at 339) where it was a discretionary sentence reflecting his personal involvement in a shooting he committed as an adult.

¶ 22      Because Thompson's sentence was discretionary, his case is readily distinguishable from cases involving mandatory sentences where the trial court may have wished to show leniency to a youthful offender but was precluded from doing so by the statutory sentencing scheme. During sentencing, the trial court could and did consider all available mitigating circumstances, including Thompson's youth. The court nevertheless found that these mitigating circumstances were outweighed by his "horrendous decision" to open fire on a "crowded street" where "other people could have been shot as well."  Under these circumstances, the court found a sentence greater than the minimum to be appropriate. As we have previously observed, "nothing in *Miller* or *Holman* suggests that we are free to substitute our judgment for that of the sentencing court." *People v. Croft*, 2018 IL App (1st) 150043, ¶ 33, appeal denied, 98 N.E. 3d 28 (2018), and cert. denied sub nom. *Croft v. Illinois*, 139 S. Ct. 291 (2018).

¶ 23      Just as importantly, Thompson's sentence reflects his personal culpability, since he directly participated in the shooting. During sentencing, the trial court explicitly found that Thompson and his codefendant shared equal culpability. In this regard, this case is analogous to *People v. Carrion*, 2020 IL App (1st) 171001, and *People v. Handy*, 2019 IL App (1st) 170213, both cases in which we rejected a defendant's attempt to extend *Miller* via the proportionate penalties clause to young adult defendants for crimes they personally committed.

¶ 24      In *Carrion*, 2020 IL App (1st) 171001, the 19-year-old defendant entered the apartment of an elderly woman and stabbed her to death. He was convicted of residential burglary and murder and sentenced to 55 years' imprisonment. *Id.* ¶ 16. He sought, and was denied, leave to

file a successive postconviction petition raising a proportionate penalties claim. In affirming, we held that his sentence "does not shock the moral sense of the community and thus is not cruel or degrading," because he "committed [his crimes] as the principal at the legal age of adulthood." *Id.* ¶ 30.

¶ 25    Similarly, in *Handy*, 2019 IL App (1st) 170213, we declined to extend *Miller* to a defendant who, at age 18 ½, actively participated in robbing the victims' home. We explained:

> "Whether a defendant physically committed the offense is a significant consideration for courts tasked with deciding whether to extend *Miller* principles to a young adult under the proportionate penalties clause. [Citations.] Here, we cannot overlook defendant's active participation where he invaded the victims' house with the codefendants, held a gun to Mr. W.'s head to prevent him from interfering while the codefendants robbed and attacked his family and kidnapped his young daughter, and then actively participated in the gang rape." *Id.* ¶ 40 (citing *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 38 (not extending *Miller* principles where the 18-year-old defendant personally stabbed three victims to death); *People v. Thomas*, 2017 IL App (1st) 142557, ¶ 34 (not extending *Miller* principles where the 18-year-old defendant "was the active shooter convicted of first degree murder using a firearm that proximately caused one victim's death"); *People v. Ybarra*, 2016 IL App (1st) 142407, ¶ 27 (not extending *Miller* principles where the 20-year-old defendant was the one who "pulled the trigger")).

Likewise, in the present case, we cannot overlook Thompson's active participation in the shooting incident that killed one victim and wounded another.

¶ 26    *People v. Harris*, 2018 IL 121932, and *People v. House*, 2019 IL App (1st) 110580-B, are both distinguishable because they involved mandatory sentences that frustrated the discretion

of the trial court. The *Harris* defendant received a mandatory 76-year sentence for murder and attempted murder he committed at the age of 18; the trial court stated at sentencing, "I am sorry that the sentencing parameters are such that my options are somewhat limited." *Harris*, 2018 IL 121932, ¶ 16. Our supreme court rejected defendant's proportionate penalties claim on direct appeal, finding it "premature," but it observed in dicta that defendant was "not necessarily foreclosed" from bringing his claim in a postconviction petition. *Id.* ¶¶ 46, 48.

¶ 27    Following the *Harris* decision, in *House*, 2019 IL App (1st) 110580-B, the court vacated a mandatory natural life sentence for a 19-year-old who acted as a lookout while his fellow gang members committed a murder. In doing so, the court found it significant that "[t]he [trial] court's ability to take any factors into consideration was negated by the mandatory nature of defendant's sentence." *Id.* ¶ 64. The court further found that the court was precluded from taking into account defendant's rehabilitative potential, which was "especially relevant" given his lack of actual participation in the shooting. *Id.*

¶ 28    Here, unlike in *Harris* and in *House*, the trial court's discretion to take mitigating factors into consideration was not frustrated by mandatory minimums, nor was Thompson convicted on a theory of accountability for a crime in which he lacked personal involvement. Accordingly, Thompson's sentence did not violate the proportionate penalties clause as a matter of law.

¶ 29    Second, even assuming *arguendo* that *Miller* principles did apply to Thompson, the record reflects that his sentencing was *Miller*-compliant. In this regard, we are mindful that there are no "magic words" that the sentencing court must use in order to comply with *Miller*. *People v. Lusby*, 2020 IL 124046, ¶ 33 fn.2. In particular, the sentencing court is not required to make a finding of fact regarding a juvenile defendant's incorrigibility. *Id.* (citing *Montgomery v.*

*Louisiana*, 577 U.S. ___, 136 S. Ct. 718, 735 (2016)). Rather, our supreme court has set forth a non-exhaustive list of characteristics that the sentencing court should consider:

"(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation."

*Holman*, 2017 IL 120655, ¶ 46.

¶ 30    Here, the record reflects that the sentencing court heard and considered evidence relating to each of these factors. First, Thompson was 19 when he committed the shooting in this case, a fact which the trial court explicitly took into account when delivering sentence.

¶ 31    Second, regarding Thompson's family and home environment, the court considered his PSI report, which did not reflect that he came from a "horrific, crime-producing setting[]" as discussed in *Miller*, 567 U.S. at 471. On the contrary, Thompson was not abused as a child; he had no family history of criminality or gang affiliation; and he was financially supported by his mother.

¶ 32    Third, as noted, Thompson personally participated in the shooting, and the trial court took his individual culpability into account, finding Thompson and his codefendant to be equally responsible for the crime. The record does not reflect that Thompson was affected by familial or peer pressure, particularly since he disavowed any gang affiliation.

¶ 33    Fourth, no evidence was presented regarding Thompson's incompetence. On the contrary, his PSI report reflects that he had no history of substance abuse or mental illness which might have affected his ability to deal with police officers, prosecutors, or his counsel.

¶ 34    Finally, in regards to his rehabilitative potential, Thompson presented evidence that he had obtained a degree in jail, as well as several letters from people describing him as "a liked, happy, good-hearted kid."  The sentencing court reviewed these letters individually, concluding that they were "very nice" but their value in mitigation was outweighed by the circumstances in aggravation, particularly the fact that Thompson opened fire on a "crowded street" where "other people could have been shot as well."

¶ 35    In sum, the record reflects that "[t]he trial court presided over the case from beginning to end and considered the defendant's youth and its attendant characteristics before concluding that his future should be spent in prison." *Lusby*, 2020 IL 124046, ¶ 52 (holding that juvenile defendant's *de facto* discretionary life sentence was constitutional under *Miller*). Thompson had a full opportunity to present mitigating evidence on his behalf and did, in fact, avail himself of that opportunity. Thus, even if Thompson could claim the benefit of *Miller*, the record positively rebuts any contention that he is entitled to resentencing, and summary dismissal of his postconviction petition was proper. See *Phyfiher*, 361 Ill. App. 3d at 885 (petitioner's allegations substantively rebutted by record were frivolous and patently without merit).

¶ 36    We acknowledge that a number of recent panels of this court have held that 18- and 19-year-old defendants who received discretionary life sentences (*de facto* or otherwise) for murder were entitled to raise *Miller* claims in successive postconviction petitions. *People v. Carrasquillo*, 2020 IL App (1st) 180534; *People v. Ruiz*, 2020 IL App (1st) 163145; *People v. Johnson*, 2020 IL App (1st) 171362; *People v. Minniefield*, 2020 IL App (1st) 170541. We do

not find these cases persuasive here, for two reasons. First, as discussed, we find *Carrion*, *Handy*, and the cases cited therein to be more persuasive on the issue of discretionary sentences for young adult defendants who are personally culpable for their crimes. See *Carrion*, 2020 IL App (1st) 171001, ¶ 35 (rejecting *Ruiz* and *Johnson*). Secondly, also as discussed, the sentencing record in this particular case positively rebuts any claim that Thompson is entitled to resentencing under *Miller*. The trial court properly heard mitigating evidence related to Thompson's youth and attendant characteristics and, in the exercise of its sound discretion, concluded that a sentence above the minimum was appropriate. Under these facts, Thompson's attempt to obtain a second bite at the sentencing apple is frivolous and patently without merit, and the trial court properly dismissed his petition.

¶ 37                               CONCLUSION

¶ 38          For the foregoing reasons, we affirm the circuit court's first-stage dismissal of Thompson's postconviction petition.

¶ 39          Affirmed.

¶ 40          JUSTICE HYMAN, dissenting:

¶ 41          I respectfully dissent. The majority's analysis runs counter to first stage postconviction proceedings. We are at the *pro se* pleading stage of Thompson's first postconviction petition. The purpose of these proceedings is to offer evidence from *outside* the record to support constitutional claims, and, at the first stage, the defendant needs only satisfy exceedingly low pleading requirements. Might Thompson fail to ultimately provide additional evidence to support his claim? Sure. Might the trial court consider any evidence he does provide and, ultimately, discredit it? It could. But, might Thompson provide information that was not presented to the trial court at his original sentencing hearing casting doubt on the propriety of a discretionary life

-12-

sentence? His pleadings (taken as true and liberally construed) show that he may, and, so, I would allow his claim to move forward for adversarial testing before the trial court.

¶ 42                                Postconviction Proceedings

¶ 43        Postconviction proceedings receive and test evidence from outside the record. *E.g.* *People v. Pitsonbarger*, 205 Ill. 2d 444, 455-56 (2002) (postconviction proceedings limited to issues that were not, and could not have been, raised on direct appeal). The majority, relying on the trial court's ostensible consideration of the factors our supreme court set out in *People v. Holman*, 2017 IL 120655, finds the record "positively rebuts" Thompson's constitutional claim. I disagree because in the original sentencing record the evidence at the heart of his claim—the developing brain science showing juvenile immaturity extends into young adulthood—never gets mentioned at all.

¶ 44        Here's the crux of Thompson's claim from his petition:

> "Petitioner attaches the 'science and social science' evidence to this petition. Further, a neurologist and psychiatrist should be appointed to properly evaluate petitioner and obtain his school and psychiatric records for evaluation, with the appointment of a 'mitigation expert' to present the court with a report of the petitioner's home, school, education, and attendant characteristic lifestyle at the time of the offense. Where there is sufficient evidence available at sources that petitioner does not have access [to] due to his incarceration, experts can present a plausible argument of 'immaturity' and 'brain deficiencies' to reduce culpability."

¶ 45        At Thompson's initial sentencing hearing, he presented no "science and social science" evidence to the trial court. But, as *People v. Hill*, 2020 IL App (1st) 171739, ¶¶ 12-19, shows, an expert can offer considerably more insight into the impact of certain life circumstances on

juvenile development. Indeed, an expert can opine on an offender's rehabilitative potential in concrete predictive terms that do not appear in the raw data of a PSI. *Id.* ¶¶ 18-19. Thompson's petition, liberally construed, makes allegations that similar expert analysis applies to him; at a minimum, his petition "suppl[ies] sufficient factual basis to show the allegations in the petition are capable of objective or independent corroboration," the standard set by our supreme court. *People v. Allen*, 2015 IL 113135, ¶ 4 (internal quotations omitted).

¶ 46     Thompson's petition emphasizes the "science and social science" evidence he attached to his petition, showing that adolescent brain development continues into young adulthood. He includes a plethora of articles supportive of that claim. Thompson argues he should be given an opportunity to "obtain his school and psychiatric records." Construing his allegations liberally, as this court must, Thompson alleges that he has received mental health treatment (because otherwise those records would not exist). He further alleges that an expert could present evidence of his "immaturity" and "brain-deficiencies" to establish his reduced culpability. Again, construing those allegations liberally, for an expert to be able to testify to evidence of Thompson's particular immaturity or brain development, the evidence must exist.

¶ 47     Taken as true and liberally construed, Thompson has alleged sufficient facts to go forward on his sentencing claim based on "juvenile maturity and brain development." See *People v. Harris*, 2018 IL 121932, ¶ 46. At least, by referring to the existence of records that an expert could evaluate, he has shown his claim is "capable of objective or independent corroboration." *Allen*, 2015 IL 113135, ¶ 25 (reciting standard).

¶ 48     Because Thompson's allegations center around evidence outside the original sentencing record, the majority's analysis—applying a retrospective *Miller* analysis in the style of *People v.*

*Holman*, 2017 IL 120655 and *People v. Lusby*, 2020 IL 124046—fails on its own terms. It is far from clear these cases apply when dealing with young adult offenders like Thompson.

¶ 49    Our supreme court has never held a retrospective *Miller* analysis is appropriate, much less required, for young adult defendants claiming protection under the proportionate penalties clause. Both *Lusby* and *Holman* involve defendants who were juveniles at the time of their offenses raising exclusively Eighth Amendment challenges. *Lusby*, 2020 IL 124046, ¶ 1 (age 16); *Holman*, 2017 IL 120655, ¶ 1 (age 17). For reasons this court has already explained, the difference between retrospectively applying *Miller* to juvenile sentencing (where *Miller* presumptively applies) and young adult sentencing (where it does not) matters and counsels against a retrospective analysis at the early stages of collateral proceedings for young adults. *E.g.* *People v. Ruiz*, 2020 IL App (1st) 163145, ¶¶ 47-52. For juvenile offenders, courts may be able to indulge the fiction (and I emphasize it is a fiction) that sentencing judges, by some divination, viewed evidence at a pre-*Miller* sentencing hearing through a *Miller* lens. But I fail to see how a trial court could possibly have viewed the relevant sentencing facts in their proper constitutional scope when the law applying *Miller* principles to young adults through the proportionate penalties clause was and still is not settled. Mentioning the *Holman* factors and considering them with their due constitutional weight are altogether different.

¶ 50    Also, both *Lusby* and *Holman* involve juvenile offenders seeking leave to file successive postconviction petitions. To file a successive petition, these defendants had to show cause for and prejudice from failing to raise the claim sooner, a "higher burden than the frivolous or patently without merit standard applied at first-stage proceedings." *People v. Moore*, 2020 IL App (4th) 190528, ¶ 15. It is logical, or at least defensible, to require a retrospective *Miller* analysis for juvenile defendants who later file successive postconviction petitions raising *Miller*

claims—juvenile defendants cannot be prejudiced if they originally received the constitutional considerations to which they claim they are entitled. Those considerations are not before us—Thompson is litigating his *first* postconviction petition.

¶ 51    Finally, I continue to disagree with the analysis in *People v. Handy*, 2019 IL App (1st) 170213, and the cases that rely on it. The majority cites *Handy* for two propositions: (i) that young adult offenders who are personally culpable (as opposed to merely accountable) for their crimes automatically fall outside *Miller*'s countenance, and (ii) that the discretionary nature of Thompson's sentence means he is categorically ineligible for relief. See *id.* ¶¶ 40-41. These distinctions are incompatible with *Miller* itself and, should Thompson show *Miller* applies to him, they evaporate completely.

¶ 52    As I have explained elsewhere, *Miller* prohibits life without parole for juvenile offenders—even offenders who are the primary actors in heinous crimes. See *e.g.*, *Ruiz*, 2020 IL App (1st) 163145, ¶¶ 3, 38-39 (citing *Miller*, 567 U.S. at 465-68)). So, if Thompson can show *Miller* applies to him, what difference does it make that he was convicted as a principal? None that I can see. In a similar vein, the Illinois Supreme Court has extended *Miller* protections to juveniles who receive discretionary life sentences. *Id.* ¶ 40 (discussing *Buffer*, 2019 IL 122327 and *Holman*, 2017 IL 120655). Again, should Thompson show *Miller* principles apply to him as a young adult, why does the discretionary nature of his sentence take him out from under those protections? The simplest answer: it does not.

¶ 53    Much more could be said about the inherent flaws in cases like *Handy* or in the idea of retrospective *Miller* analyses but that is not my primary disagreement with the majority. We should be asking ourselves two questions. First, are the factual allegations Thompson makes "fantastic or delusional" (*Allen*, 2015 IL 113135, ¶ 25)? As I have demonstrated, they are not;

presumed to be true and construed liberally, Thompson's factual claims depend on information outside the record and capable of independent corroboration. Second, is Thompson's legal claim "indisputably meritless" (*id.*)? The majority acknowledges disagreement in this area of the law. *Supra*, ¶ 36. The majority may quarrel with Thompson's legal arguments for applying *Miller* principles to him as a young adult offender; however, until our supreme court weighs in, Thompson's claim is a far cry from *indisputably* meritless.

¶ 54       Accounting for the extra-record evidence and the proper standard of first-stage review, Thompson's petition states the "gist" of a constitutional claim. Thompson should be permitted to test that claim in further proceedings consistent with the Post-Conviction Hearing Act.