2021 IL App (1st) 181926-U
Order filed: January 15, 2021

FIRST DISTRICT
FIFTH DIVISION

No. 1-18-1926

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 08 CR 22936 |
| | ) | |
| KIEARRE REESE, | ) | Honorable |
| | ) | Domenica A. Stephenson, |
| Defendant-Appellant. | ) | Judge, presiding |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirmed the circuit court's order denying defendant leave to file a successive postconviction petition alleging an as-applied proportionate penalties violation, finding that he failed to satisfy the cause-and-prejudice test. We reversed the order denying defendant leave to file a successive petition alleging actual innocence and remanded for second-stage proceedings thereon.

¶ 2    Defendant, Kiearre Reese, appeals the circuit court's order denying him leave to file a successive postconviction petition alleging actual innocence and a violation of the proportionate penalties clause as applied to him. Defendant argues that he made a colorable claim of actual

innocence and showed cause and prejudice for failing to raise the proportionate penalties claim earlier. We reverse the portion of the order denying defendant leave to file a successive postconviction petition alleging actual innocence and remand for second-stage proceedings thereon. We affirm the denial of his request for leave to file a successive postconviction petition alleging an as-applied proportionate penalties violation[1].

¶ 3    The State charged defendant with the first degree murder of Marshawn Melcher and the attempted first degree murder of Terelle Griffin. The State's theory of the case was that at about 10:30 p.m. on August 8, 2008, defendant shot and killed Melcher and shot and injured Griffin in Meyering Park (the park) in Chicago after an argument erupted during a dice game. At trial, the State presented evidence from seven witnesses, including two eyewitnesses to the shooting, Griffin and Marvel Williams.

¶ 4    Williams was 11 years old at the time of the shooting. He testified that at about 10:30 p.m. on August 8, 2008, he observed defendant, Melcher and Griffin playing dice at the park. At some point during the dice game, Melcher asked defendant to give him two dollars so that he could pay for bus fare to go home. An argument ensued, and defendant shot Melcher in the chest and then shot Griffin. Williams did not see Melcher or Griffin with a gun. After the shooting, Williams saw a person named Darius grab a gun from beneath a bush and run off with it before the police arrived.

¶ 5    Griffin testified that on the night of the shooting he played a dice game with Melcher, Martino Mosby, and Darius Ballark. He left the park because someone told him that the dice game was going to be robbed, but he returned 20 to 30 minutes later and observed defendant shoot

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

Melcher. Griffin tried to flee, but defendant shot him in the chest. Griffin testified that neither he nor Melcher had any weapons in the park, and never threatened defendant. On cross-examination, Griffin acknowledged that he had five prior felony convictions for drug offenses and an escape from electronic monitoring, and he also admitted to lying to the police about his name and birth date. He admitted stashing guns in the bushes of the park in the past because it was part of his drug territory, but he testified he did not do so on the night of the shooting.

¶ 6     Detective Clifford Martin testified he arrived at the park at about 11:30 p.m. on August 8, 2008. Police officers had already cordoned off the area, questioned persons at the scene, and collected evidence. Detective Martin did not speak with Williams that night because he had already been taken home.

¶ 7     Detective Martin and his partner went to the hospital, where they attempted, unsuccessfully, to speak with Griffin, who was undergoing a medical procedure. They spoke to Griffin's mother instead. Subsequently, Detective Martin put together a six-person photo array. On August 12, 2008, he returned to the hospital and showed Griffin the photo array. Griffin identified defendant as the shooter.

¶ 8     Detective Martin went to Williams' home on August 15, 2008, and spoke with him about the shooting. Williams stated that he saw Melcher ask a man, whom he could not identify, for two dollars. The man pulled out a gun and shot Melcher and Griffin. Detective Martin did not show Williams the photo array.

¶ 9     On August 31, 2008, Williams and his mother came to the police station for further questioning. Detective Martin showed Williams the photo array and he identified defendant as the shooter. Williams told Detective Martin that defendant "won all the money" in the dice game and Melcher became angry and gave some sort of signal to Griffin. A man in a hooded sweatshirt

handed defendant a gun, and he shot Melcher and Griffin. Griffin tried to retrieve a gun from some bushes but was unable to do so.

¶ 10 During grand jury proceedings in November 2008, Williams gave a different account of how defendant retrieved the gun, stating he had seen a girl (not a man in a sweatshirt) pass a gun to defendant at the park prior to the shooting.

¶ 11 The parties stipulated that Dr. Kendall Crowns would testify he performed Melcher's autopsy and opined that Melcher died of a gunshot wound to the chest and the manner of death was homicide.

¶ 12 The State rested and defendant did not present any evidence.

¶ 13 The jury convicted defendant of first degree murder and attempted first degree murder and found that during the commission of those crimes, he personally discharged a firearm that proximately caused death or great bodily harm to another person. The trial court sentenced him to the minimum term under the applicable statutes, specifically, consecutive terms of 20 years for first degree murder plus a mandatory 25-year firearm enhancement, and 6 years for attempted murder, plus a mandatory 25-year firearm enhancement, for a total of 76 years' imprisonment.

¶ 14 Defendant filed a direct appeal, arguing that "he was denied effective assistance of counsel because trial counsel pursued a second degree murder theory in both cross-examination and in the instructions tendered to the jury, but abandoned that theory in closing argument in favor of a theory of misidentification." See *People v. Reese*, 2014 IL App (1st) 113003-U, ¶ 2. We affirmed. *Id.*

¶ 15 Defendant subsequently filed a *pro se* postconviction petition. Defendant alleged that his trial counsel provided ineffective assistance by: (1) coercing him into waiving his right to testify at trial; (2) denying him his right to personally decide whether to pursue a defense based on second-

degree murder and aggravated battery with a firearm; and (3) failing to interview, investigate or subpoena a prospective defense witness named Lamar Collins-Thompson.

¶ 16    Defendant's petition included a notarized affidavit signed by Collins-Thompson, who attested that on August 8, 2008, he heard Griffin tell another man that he and Melcher were going to rob defendant because defendant was cheating at dice. Defendant and Melcher began arguing. Griffin went to the bushes and came back with a black gun and defendant shot at him three or four times. Collins-Thompson got on the ground and saw a man take the gun from Griffin and run out of the park. Collins-Thompson later saw defendant at Menard Correctional Center in 2013 after the trial and he told defendant that he had witnessed the shooting but had not come forward because he had just come home from the juvenile center and was on probation and he did not want "trouble from the boys in the hood." He was not interviewed by police or by defendant's attorney.

¶ 17    On January 28, 2015, the postconviction court summarily dismissed defendant's petition at the first stage of the proceedings, finding his claims of ineffective assistance were frivolous and patently without merit.

¶ 18    Defendant appealed the summary dismissal, arguing that the postconviction court erred because his petition adequately alleged a claim of actual innocence, based on Collins-Thompson's affidavit indicating that defendant fired his weapon in self-defense only after Griffin approached with a black gun. See *People v. Reese*, 2017 IL App (1st) 150837-U, ¶ 22. Defendant also argued on appeal that he had adequately alleged ineffective assistance based on counsel's decision to only argue a misidentification defense at trial and to "coerce" and "trick" him into waiving his right to testify. *Id.* ¶¶ 40-53.

¶ 19    We affirmed in an order filed on June 16, 2017, holding that defendant's postconviction claims of ineffective assistance were barred by *res judicata* and/or were otherwise frivolous or

patently without merit. *Id.* We also held that defendant forfeited his claim of actual innocence by failing to raise it in his petition and that his recourse was to file a successive petition properly alleging actual innocence based on newly discovered evidence. *Id.* ¶¶ 22-38.

¶ 20    On July 17, 2017, defendant filed a motion for leave to file a successive petition that alleged he was actually innocent based on newly discovered evidence that he had acted in self-defense. In support of his claim, defendant submitted the affidavits of Marvell Williams, Fareed Jackson, and Cadavious Barrett, and a purported letter he had received from Terrell Griffin.

¶ 21    In Williams' affidavit, dated November 10, 2016, he recanted his trial testimony that none of the victims were armed when defendant shot at them. Williams attested that after Melcher and defendant argued in the park, Griffin retrieved a gun from some bushes and pointed it at defendant, after which defendant pulled out his gun and began shooting. Williams explained that he had testified falsely at trial because Griffin had threatened to kill him if he testified that he saw Griffin with a gun.

¶ 22    Jackson attested in his affidavit, dated August 5, 2015, that while he and Griffin were both in a holding cell at Stateville Correctional Center on September 12, 2011, he asked Griffin about the circumstances of the shooting. Griffin told him that on the night of the shooting, defendant was winning money at a dice game and Melcher decided to rob him. Melcher and Griffin told Martino Mosby to retrieve a gun from 70th and Vernon. When Mosby returned with the gun, they directed him to hide it in some bushes. Melcher then began arguing with defendant in order to distract him while Griffin grabbed the gun and began sneaking up on defendant in order to rob him. Defendant saw Griffin pointing the gun at him, and he then pulled out his own gun and began shooting. Griffin lied at trial about what really happened because he did not want to be charged and convicted of felony murder in connection with Melcher's death.

¶ 23    Jackson told a friend named Damien, who was incarcerated with him, about what Griffin had told him regarding the shooting. When Damien was released in 2015, he wrote defendant a letter about Griffin's statement and defendant then contacted Jackson. Jackson confirmed the information contained in his affidavit.

¶ 24    Barrett attested in his affidavit, dated December 21, 2017, that he was in the park on the night of the shooting and saw two men arguing. A man in a red baseball hat, armed with a gun, approached the two men who were arguing. One of the men who had been arguing then pulled out a handgun and shot at the man in the red hat. In 2017, a friend of Barrett, who knew the shooter's brother, asked Barrett if he would be willing to state what he had witnessed if "called to do so." Barrett replied that he would be willing to repeat what he witnessed.

¶ 25    Griffin's letter was postmarked February 5, 2016, and sent to defendant at Menard Correctional Center. Griffin admitted that he had lied at trial when he testified that neither he nor Melcher had any weapons in the park and that he knew defendant had seen one of Griffin's companions with a gun prior to the shooting. Griffin explained that he had been unable to notarize the letter because he did not have a State ID, but that he was willing to testify consistent with the letter. If asked anything incriminating, though, he would plead the fifth amendment.

¶ 26    Defendant filed his own affidavit, dated July 17, 2017, attesting that he received the letter from Griffin in February 2016. Defendant tried to contact Griffin to obtain a notarized affidavit but was unable to do so and he subsequently learned in November 2016 that Griffin had been shot and killed. Defendant appended a redacted Chicago Police Department incident report about a homicide on November 2, 2016, listing Griffin as the shooting victim.

¶ 27    Defendant also alleged in his motion for leave to file a supplemental petition that his trial counsel was ineffective for failing to conduct an adequate investigation into the evidence

supporting his self-defense claim. Defendant submitted an affidavit from Anthony McGee to support his claim.

¶ 28    In his affidavit dated December 2, 2015, McGee attested that on the night of the shooting, he watched a dice game at the park. Melcher gave him some money to buy a 22 ounce can of "211 beer." McGee bought the beer, returned to the park, and heard Griffin ask Melcher whether he was ready to rob defendant. Melcher responded affirmatively and told Griffin to get the gun. Melcher then began arguing with defendant and demanded money while Griffin quickly came up behind and pointed a gun at defendant. Defendant saw Griffin pointing the gun at him and began shooting his own gun at Griffin. McGee ran away. In 2015, McGee "ran into" defendant and told him for the first time about what he had seen on the night of the shooting.

¶ 29    Defendant also alleged in his motion for leave to file a supplemental petition that as applied to him, his 76-year mandatory, *de facto* life sentence, for an offense committed when he was 25 years old, violated the proportionate penalties clause under *Miller v. Alabama*, 567 U.S. 460 (2012).  We will discuss *Miller* more fully later in this order.

¶ 30    On May 10, 2018, the postconviction court denied defendant leave to file his successive petition. Defendant filed a motion to reconsider that the court denied on August 3, 2018. Defendant filed a timely notice of appeal.

¶ 31    First, defendant contends that the postconviction court erred by denying him leave to file a successive petition raising a claim of actual innocence.

¶ 32    The Post-Conviction Hearing Act (Act) provides a procedural mechanism by which defendant may assert violations of his constitutional rights in his original trial or sentencing. 725 ILCS 5/122-1(a)(West 2018); *People v. Allen*, 2015 IL 113135, ¶ 20. A postconviction proceeding is not a substitute for appeal, but rather it offers a mechanism for defendant to assert a collateral

attack on a final judgment. *People v. Robinson*, 2020 IL 123849, ¶ 42. Where defendant has previously challenged his judgment of conviction on appeal, the judgment of the reviewing court will bar postconviction review of all issues actually decided by it as well as any other claims that could have been presented. *Id.* As a consequence, only one postconviction proceeding is contemplated under the Act. *Id.* However, the bar against successive petitions will be relaxed on two grounds. *Id.* The first is where defendant can establish cause and prejudice for the failure to assert a postconviction claim in the earlier proceeding. *Id.* The second is where defendant asserts a fundamental miscarriage of justice based on actual innocence. *Id.*

¶ 33    Prior to commencing a successive postconviction petition, defendant must obtain leave of court. *Id.* ¶ 43. If leave to file is granted, a successive petition is docketed for second-stage proceedings. *Id.* In *Robinson*, the Illinois Supreme Court recently set forth the standard for evaluating claims of actual innocence in the context of a motion for leave to file a successive postconviction petition. A request for leave to file a successive petition based on actual innocence should only be denied when it is clear from a review of the petition and supporting documentation, taking as true all well-pleaded allegations that are not positively rebutted by the trial record, that the petition cannot set forth a colorable claim of actual innocence as a matter of law. *Id.* ¶¶ 44-45. Evidence is not positively rebutted simply because it was contradicted by the evidence at trial. *Id.* ¶ 60. For new evidence to be positively rebutted, the trial record must make clear that no jury could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible. *Id.* The denial of leave to file a successive petition alleging actual innocence is reviewed *de novo*. *Id.* ¶ 40.

¶ 34    To establish a claim of actual innocence, the supporting evidence must be newly discovered, material and not cumulative, and of such conclusive character as to probably change

the result on retrial. *Id.* ¶ 47. Newly discovered evidence is evidence that was discovered after trial, which defendant could not have discovered earlier through the exercise of due diligence. *Id.* Evidence is material if it is relevant and probative of defendant's innocence. *Id.* Noncumulative evidence adds to the information that the jury heard at trial. *Id.* Finally, the conclusive character element, which is the most important element of an actual innocence claim, refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id.* The *Robinson* court rejected the total vindication or exoneration standard (*id.* ¶ 55) and held that new evidence need not be entirely dispositive to be likely to alter the result on retrial; rather, the new evidence need only place the trial evidence in a different light, thereby undermining the court's confidence in the judgment of guilt. *Id.* ¶ 48. Probability, rather than certainty, is the key for determining whether the jury would reach a different result after considering the prior evidence along with the new evidence. *Id.* Leave of court to file a successive petition should be granted when defendant's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Id.* ¶ 44.

¶ 35     We note that when the postconviction court here denied defendant's motion for leave to file his successive petition in May 2018, it did not have the benefit of our supreme court's analysis in *Robinson*, which was not decided until 2020.  Understandably, then, the postconviction court's analysis of defendant's motion relied on the case law developed up to that time and did not reflect *Robinson*'s clarification of the standard for evaluating claims of actual innocence in the context of a motion for leave to file a successive petition. In deciding defendant's appeal, though, both parties agree that we must consider whether his motion for leave to file a successive petition based on actual innocence met the *Robinson* standard.

¶ 36    Defendant argues that he has met the *Robinson* standard for granting leave to file a successive petition raising a claim of actual innocence. First, defendant contends that his claim is based on newly discovered evidence, specifically, Griffin's and Williams' recantations of their trial testimony. See *People v. Harper*, 2013 IL App (1st) 102181, ¶ 42 (holding that a witness's recantation of his trial testimony was newly discovered where "due diligence could not have compelled [him] to testify truthfully at the first trial"). Likewise, the affidavits from McGee, Barrett and Jackson were also newly discovered as they did not come forward with their knowledge of the circumstances surrounding the shooting until after the trial.

¶ 37    In denying defendant leave to file, the postconviction court found that it could not consider Griffin's letter as it was not an affidavit. However, defendant correctly points out that Griffin's letter constituted "other evidence" under the Act that could properly be received as proof. See 725 ILCS 5/122-6 (West 2018) ("The court may receive proof by affidavits, depositions, oral testimony, or *other evidence*") (emphasis added). The postconviction court also rejected Jackson's affidavit because it contained hearsay, but under *Robinson*, the fact that the affidavit contained hearsay that would be inadmissible at retrial does not render it legally insufficient for postconviction proceedings, where the rules of evidence do not apply. *Robinson*, 2020 IL 123849, ¶ 78 (citing Illinois Rules of Evidence 1101(b)(3)(eff. Sept. 1, 2019)).

¶ 38    Second, defendant contends that his evidence was material, as it was relevant and probative of his claim of self-defense (*i.e.*, his innocence) based on Griffin pointing a gun at him first. The evidence was non-cumulative where nobody testified at trial to seeing Griffin with a gun prior to the shooting.

¶ 39 Finally, defendant contends that his new evidence that Griffin brandished the gun prior to the shooting meets *Robinson*'s "conclusive character" requirement as it places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt.

¶ 40 The State concurs with defendant's arguments that he met the *Robinson* standard for granting leave to file a successive petition. We agree that the *Robinson* standard has been met and reverse the denial of defendant's motion for leave to file a successive petition and remand for second-stage proceedings thereon. In so holding, we note that the postconviction court found that defendant's claim of actual innocence was barred by *res judicata* as it had been addressed on his first appeal from his conviction. Review of our order issued on the first appeal shows that we never addressed defendant's contention that he was actually innocent based on the evidence that Griffin pointed the gun at him prior to the shooting. Nor was defendant's claim of actual innocence addressed in our order issued on the second appeal from the summary dismissal. Accordingly, *res judicata* is not applicable here.

¶ 41 Next, we address whether defendant satisfied the cause and prejudice test for filing a successive postconviction claim that his sentence violated the proportionate penalties clause as applied to him. Defendant claims that we need not address this issue, that as we are reversing and remanding for second-stage proceedings on his actual innocence claim, the entire petition (including his proportionate penalties claim) must be remanded because partial summary dismissals of a petition at the first stage of proceedings are not permitted. See *People v. Rivera*, 198 Ill. 2d 364, 374 (2001) ("summary partial dismissals made during the first stage of a post-conviction proceeding are not permitted under the Act"). Defendant's argument fails because the instant case involves the denial of leave to file a successive petition, not a first-stage summary dismissal. On appeal from the postconviction court's denial of leave to file a successive petition,

we evaluate each individual claim separately. *People v. Haud*, 2016 IL App (1st) 150583, ¶ 50 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 463 (2002)). "Each claim must either meet the cause and prejudice test or, if the petitioner makes a claim of actual innocence, he must show that newly discovered evidence would probably change the result on retrial." *Id.* We have already addressed defendant's actual innocence claim and therefore we proceed to address whether his proportionate penalties claim meets the cause and prejudice test such that we should reverse the denial of his leave to file that claim and remand for second stage proceedings. Our review is *de novo*. *People v. Ross*, 2020 IL App (1st) 171202, ¶ 13.

¶ 42    Defendant shows cause by identifying an objective factor that impeded his ability to raise a specific claim during his initial postconviction proceedings. 725 ILCS 5/122-1(f)(2018). He shows prejudice by demonstrating that the claim not raised during his initial postconviction proceedings so infected the trial that the resulting conviction or sentence violated due process. *Id.*

¶ 43    Defendant has shown cause here because his proportionate penalties claim is based on Illinois cases decided after he filed his initial postconviction petition in 2013, which interpreted and expanded *Miller v. Alabama*, 567 U.S. 460 (2012). See *People v. Davis*, 2014 IL 115595, ¶ 42 (a defendant establishes cause when the legal basis for his claim was not available to him when he filed his initial petition).

¶ 44    To address the prejudice component, we must first discuss *Miller* and its Illinois progeny. In *Miller*, the United States Supreme Court held that the eighth amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" convicted of homicide. *Miller*, 567 U.S. at 479. The *Miller* court noted that "children are constitutionally different from adults for purposes of sentencing." Id. at 471. As opposed to adults, children show: (1) "a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness,

impulsivity, and heedless risk-taking," (2) heightened vulnerability to "negative influences and outside pressures" from family and peers and an inability to extricate themselves from crime-producing settings, and (3) less fixed traits, and their actions are "less likely to be evidence of irretrievabl[e] deprav[ity]." (Internal quotations omitted.) *Id.* Before a life sentence can be imposed, the sentencing court must consider "mitigating circumstances" such as "an offender's youth and attendant characteristics." *Id.* at 483, 489.

¶ 45 The Illinois Supreme Court has held that *Miller* applies to discretionary as well as mandatory life sentences (*People v. Holman*, 2017 IL 120655, ¶ 40) and also to *de facto* life sentences, or sentences that "cannot be served in one lifetime" and have "the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole" (*People v. Reyes*, 2016 IL 119271, ¶¶ 9-10). Our supreme court has further held:

"Under *Miller* \*\*\*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors

and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶ 46 In *People v. Harris*, 2018 IL 121932, our supreme court addressed the 18-year-old defendant's facial argument that the eighth amendment protections for juveniles should be applied to all "young adults under the age of 21" and his as-applied argument that his mandatory aggregate sentence of 76 years' imprisonment violated the proportionate penalties clause of the Illinois Constitution under *Miller*. *Id.* ¶¶ 37, 53.

¶ 47 The supreme court rejected defendant's facial challenge that the eighth amendment protections as articulated in *Miller* should apply not just to juveniles under the age of 18, but also to young adults ages 18 to 21, noting that the United States Supreme Court has clearly and consistently drawn the line at age 18 for purposes of juvenile sentencing protections in the eighth amendment context. *Id.* ¶¶ 58, 61.

¶ 48 While *Harris* foreclosed defendant's eighth amendment argument, it pointedly left open the possibility for an offender between ages 18 and 21 to make an as-applied challenge under the proportionate penalties clause. Defendant contended in his proportionate penalties argument that the evolving science on juvenile maturity and brain development highlighted in *Miller* applied not only to juveniles under the age of 18 but also to young adults from 18 to 21. *Id.* ¶ 46. Defendant, though, had raised his proportionate penalties claim for the first time on direct appeal and thus the trial court had not conducted an evidentiary hearing or made any findings of fact on his specific circumstances. *Id.* ¶ 40. The supreme court noted that as-applied constitutional challenges are dependent on the specific facts and circumstances of the person raising the challenge and therefore the record must be "sufficiently developed in terms of those facts and circumstances for purposes of appellate review." (Internal quotations omitted.) *Id.* ¶ 39. The record contained no evidence

-15-

about how the evolving science on juvenile maturity and brain development applies to defendant's specific facts and circumstances. *Id.* ¶ 46. Accordingly, the supreme court found that defendant's as-applied challenge under the proportionate penalties clause was premature and that such a claim was more appropriately resolved under the Act. *Id.* ¶¶ 46, 48.

¶ 49    Defendant here argues that he was only 25 years old at the time of the offense and that his 76-year sentence constituted a *de facto* life sentence that, as applied to him, violates the proportionate penalties clause and is a proper subject for postconviction proceedings under *Miller* and *Harris*. Defendant cites in support a growing body of recent scientific evidence indicating that the brains of young adults continue to develop into their early twenties and he argues that such a "scientific consensus" supports a finding that as an "emerging young adult" he should have been allowed to make a record through postconviction proceedings that at age 25, his brain was still developing, and that he was not incorrigible or incapable of rehabilitation. Defendant contends that his motion and supporting material satisfy the *prima facie* showing of prejudice prerequisite to the filing of a successive postconviction petition as to his proportionate penalties argument, and therefore his motion for leave to file a successive petition was improperly denied as to this claim.

¶ 50    Defendant relies on *People v. House*, 2019 IL App (1st) 110580-B, *pet. for leave to appeal granted*, No. 125124 (Jan. 29, 2020). In *House*, the 19-year-old defendant was convicted of two counts of first degree murder where he acted as a lookout while members of his gang killed two victims for selling drugs in their territory. *Id.* ¶¶ 5, 14, 17. He was sentenced to two consecutive mandatory life sentences. *Id.* ¶ 19. Defendant filed an amended postconviction petition alleging in pertinent part that his sentence violated the proportionate penalties clause as applied to him. *Id.* ¶ 23. The postconviction court dismissed defendant's amended petition at the second stage and defendant appealed. *Id.* ¶¶ 23-24.

¶ 51    On appeal, defendant argued that his sentence violated the proportionate penalties clause as applied to him because "he had just turned 19 years old at the time of the commission of the murders, was minimally culpable, and had no prior violent criminal history, but he received a mandatory natural life sentence without the consideration of these mitigating factors." *Id.* ¶ 33. We found that while defendant was not a juvenile, his "young age of 19 is relevant under the circumstances of this case." *Id.* ¶ 46. We noted recent research and articles indicating that the brains of young adults do not finish developing until the mid-twenties and as a result, young adults are more similar to adolescents than fully mature adults "in important ways." *Id.* ¶ 55. Specifically, they are more susceptible to peer pressure, are less future-oriented, and more volatile in emotionally charged settings. *Id.*

¶ 52    We questioned the propriety of a mandatory natural life sentence imposed on a 19-year-old defendant convicted on an accountability theory for acting as a lookout and taking orders from higher ranking gang members and noted the unfairness that he received the same sentence as the person who pulled the trigger. *Id.* ¶ 46. Finding that defendant's mandatory natural life sentence shocks the moral sense of the community (*id.* ¶ 64), we vacated his sentence and remanded for a new sentencing hearing at which he would be given the chance to present evidence supporting his as-applied proportionate penalties claim under *Miller* and its Illinois progeny. *Id.* ¶ 65.

¶ 53    There is a significant factual difference between the instant case and *House*, as defendant here was 25 years old when he committed the offenses, not a 19-year-old teenager as in *House*. Whereas the defendant in *House* was only about two years too old to still be considered a juvenile, defendant here was about eight years too old. We also note that unlike *House*, defendant was convicted as a principal who pulled the trigger, not on an accountability theory. See *People v. Handy*, 2019 IL App (1st) 170213 and *People v. Ramsey*, 2019 IL App (3d) 160759 (distinguishing

*House* where the 18-year-old defendant in each case was an active participant in the crime). But see *People v. Daniels*, 2020 IL App (1st) 171738, and *Ross* (holding that at the leave-to-file-a-successive-petition stage for offenders between the ages of 18-21, the defendant's degree of participation in the crime should not utterly disqualify him from raising an as-applied proportionate penalties claim under *Miller* and progeny).

¶ 54    A more recent case, *People v. Rivera*, 2020 IL App (1st) 171430, is informative as to how we should resolve defendant's proportionate penalties argument. In *Rivera*, defendant was convicted of first degree murder and five counts of armed robbery and sentenced to 55 years' imprisonment. *Id.* ¶ 1. On appeal, defendant contended that the postconviction court erred by denying him leave to file a successive petition. *Id.* Defendant, who was six days short of his twenty-fourth birthday at the time of the offense, argued that his sentence violated the proportionate penalties clause as applied to him and he cited *Harris* and *House* in support. *Id.* ¶ 23.

¶ 55    We found that defendant showed cause for failing to raise the proportionate penalties claim in the earlier postconviction proceedings, as the cases he relied on were decided after he filed his initial petition. (*Id.* ¶ 20). Addressing the prejudice component, we looked at legislative enactments for help in determining the age at which a person becomes an adult with a fully developed brain and noted that there were a number of legislative enactments indicating that adulthood begins at age 21[2], meaning that youthful offenders between the ages of 18 and 21 arguably can claim

---

[2]  See Pub. Act. 100-1182, § 5 (eff. Jun. 1, 2019), which makes a person convicted of first degree murder eligible for parole after serving only 20 years, if he was under 21 years old at the time of the offense and was sentenced after the law took effect; and the Juvenile Court Act of 1987 (705 ILCS 405/1-3(10), 5-105(10) (West 2018)), which defines a minor as "a person under the age of 21 years subject to this Act" and defines an adult as "a person 21 years of age or older" (705 ILCS 405/1-3(2) (West 2018)). The Illinois legislature has also prohibited the sale of nicotine and tobacco products to persons under 21 (720 ILCS 675/1 (West Supp. 2019), prohibited the sale of alcohol products to persons under 21 (235 ILCS 5/6-16(a)(i)(West 2018)), prohibited their gun ownership without parental permission (430 ILCS 65/4(a)(2)(i)

proportionate penalties protections under *Miller* and its progeny the same as juvenile offenders because their brains have not yet fully developed. *Id.* ¶ 25. However, defendant was not under 21 at the time of his offense (unlike the offenders in *Harris* and *House*, who were 18 and 19, respectively), but he was rather almost 24 years old. Defendant contended that "the same considerations, which were applied to under-18-year-olds and which have been arguably extended in some cases and statutes to under-21-year-olds should be extended further to under 24-year-olds like himself." *Id.* ¶ 27. We disagreed, holding that "[i]f such an extension should be made *** it should be made by our legislature or our highest court" as they are "in a better position to draw clear, predictable and uniform lines for our state." *Id.* Accordingly, we found that defendant was too old to raise an as-applied proportionate penalties claim under *Miller* and its Illinois progeny and therefore that he had failed to show he was prejudiced by his to inability to raise such a claim in his initial petition. ¶ 28. Even if defendant's age did not make him too old to make his proportionate penalties claim, he failed to show prejudice because he did not allege facts supporting his argument that his brain was akin to a juvenile's brain at the time of the offense. *Id.* ¶ 26 ("Defendant's actions in this case set forth none of the immaturity or impetuosity that are the hallmarks of youth"). We affirmed the denial of his motion for leave to file a successive petition. *Id.* ¶ 30.

¶ 56    In the present case, defendant was 25 years old at the time he shot and killed Melcher and shot and injured Griffin, making him too old under *Rivera* to raise an as-applied proportionate penalties challenge pursuant to *Miller* and its progeny. As a 25-year-old at the time of the shooting,

---

(West 2018)), and limited Class X sentencing for recidivist offenders to those offenders "over the age of 21 years" (730 ILCS 5/5-4.5-95(b)(West 2018)).

defendant's age distinguishes this case from those decisions allowing young adults in their late teens and early twenties to raise a *Miller*-based, proportionate penalties challenge. See *e.g.*, *People v. Ross*, 2020 IL App (1st) 171202 (age 19); *People v. Savage*, 2020 IL App (1st) 173135 (age 21 years and 7 months). Also unlike those cases, defendant has alleged no facts showing that the evolving science on juvenile maturity applied to his specific circumstances, *i.e.*, that his 25-year-old brain was functionally equivalent to a juvenile's brain at the time he pulled the trigger. See *Ross*, 2020 IL App (1st) 171202, ¶ 26 (to file a successive petition raising an as-applied proportionate penalties claim under *Miller* and its Illinois progeny, the non-juvenile defendant must make factual allegations that there were issues particular to him at the time of his offense, such as his family history, or evidence of drug addiction or mental health problems, that rendered him functionally younger than his chronological age.) Defendant points only to his nonviolent criminal background and the evidence that he passed the GED in prison and has been involved in his children's lives as evidence of his capacity for rehabilitation, but even taken as true those factual allegations in and of themselves do not tend to show that his 25-year-old brain was the functional equivalent of a juvenile's when he killed Melcher and injured Griffin. In fact, defendant's earning of the GED and his involvement with his children reflect a certain level of maturity, *not* immaturity. In the complete absence of any well-pleaded facts showing that defendant's individual characteristics functionally rendered him at least eight years younger than his chronological age of 25 so as to make him akin to a juvenile, his as-applied proportionate penalties argument under *Miller* and its progeny fails. Accordingly, defendant has not shown that he was prejudiced by his inability to raise the as-applied proportionate penalties claim in his initial petition. Therefore, we affirm the denial of his motion for leave to file a successive petition raising that claim.

¶ 57    For all the foregoing reasons, we affirm the denial of defendant's motion for leave to file a successive petition alleging an as-applied proportionate penalties violation, reverse the denial of his motion for leave to file a successive petition alleging actual innocence, and remand for second-stage proceedings on the actual innocence claim only.

¶ 58    Affirmed in part, reversed in part, and remanded.