

**NOTICE**
The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.



**corrected copy**

2021 IL App (1st) 170946-U
No. 1-17-0946

SECOND DIVISION
March 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit Court of |
| | ) Cook County, Illinois |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) No. 02 CR 2948 |
| | ) |
| MANUEL METLOCK, | ) Honorable Alfredo Maldonado, |
| | ) Judge Presiding |
| Plaintiff-Appellant. | ) |

---

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith concurred in the judgment.
Justice Lavin dissented.

### ORDER

*Held*: The circuit court erred in denying petitioner's petition for leave to file his successive post-conviction petition where he established the required cause and prejudice with respect to his as-applied proportionate penalties challenge to his 50 year *de facto* life sentence for a crime he committed when he was 20 years of age.

¶1     This appeal arises from the circuit court's denial of defendant Manuel Metlock's motion for leave to file a successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1, *et. seq.* (West 2016)). In 2004, Metlock was convicted by a jury of first-degree murder based on a theory of felony murder, where defendant was found to have caused the death of a victim during the commission of an attempted armed robbery. The jury also found that during the

commission of the of the offense defendant personally discharged a firearm that proximately caused the death of Loroxon Brown. He was sentenced to 25 years imprisonment for one count of first-degree murder plus the statutory firearm enhancement for a total of 50 years. He was 20 years old at the time of the offense.

¶ 2 Metlock filed a direct appeal in 2004, in which this court affirmed the judgment of the circuit court. Subsequently, Metlock filed a post-conviction petition, which was summarily dismissed. Metlock argues the circuit court erred in not granting him leave to bring a successive post-conviction petition, where Metlock established cause and prejudice by asserting that his sentence is a *de facto* life sentence violates the eighth amendment to the United States Constitution (U.S. Const. amend VIII) and the proportionate penalties clause of the Illinois Constitution (Ill.Const. art. 1 § 11). We reverse and grant Petitioner leave to file a successive postconviction petition.

¶ 3      I. BACKGROUND

¶ 4 Metlock was charged by indictment with nine counts of first-degree murder (720 ILCS 5/91(a)(1), (2) (3) West 2000)); two counts of attempt first degree murder (*id.* § 8-4(a), 9-1(a)(1) (West 2000)); one count of aggravated battery with a firearm (*id.* § 12-4.2(a)(1) (West 2000)); and one count of attempt armed robbery (*id.* § 8-4(a), 18-2(a)(2) (West 2000)), arising from an incident in Chicago, Illinois on September 1, 2000. During trial, the State announced that it was proceeding only on three counts of first-degree murder.

¶ 5      A. Trial and Direct Appeal

¶ 6 Because this case concerns a constitutional challenge to Metlock's sentence, we set forth a brief summary of the facts adduced at trial and the procedural history.

¶ 7    Rolando Clark testified that on the evening of September 1, 2000, Metlock, Loroxon Brown, Clark and Yakeeta Little stopped at a carry out restaurant on 95th street to get something to eat. Brown was in the driver's seat, Clark was in the front passenger's seat, Metlock was in the back seat behind Brown and Little was in the back seat behind Clark. Clark testified that as he exited the vehicle, he saw a pistol in Little's waistband and told Brown. Brown said she would "'take care of it.'" Clark then walked to the restaurant, ordered food, and brought it back to the vehicle.

¶ 8    Clark further testified that after the group ate, Metlock directed Brown as Brown drove to 105th Street and Prospect Avenue. Metlock directed Brown to drive down a "U-shaped alley" and slow down. Little jumped out of the vehicle. Clark and Brown turned around saw "the muzzle of [a] gun" held by Metlock and heard a shot. Brown "hit***the gas of the car," crashed the vehicle into a pole, exited the vehicle and ran. Clark "play[ed] dead." Then Metlock pulled Clark out of the vehicle by the arm and shirt, walked around Clark, and patted Clark down "for narcotics or money or something," but did not take anything. Metlock approached a gate, which Clark heard open and close. Clark realized he had been shot in the back. At the hospital the next morning, Clark spoke with detectives and identified Metlock and Little as the offenders.

¶ 9    Little's testimony largely corroborated Clarks' testimony. However, Little added that after the group ate, Metlock mentioned "get[ting] some money" by "hit[ting] a lick." Little explained that a "lick" meant "a robbery or you come up with some money many ways." Afterwards they drove to drop Metlock off somewhere, and Metlock gave directions. In the vehicle's backseat, Metlock showed Little a firearm and made a downward gesture towards it.

¶ 10    They drove down an alley, and Little exited the vehicle because she "had a funny feeling." She reached a friend's house nearby and heard two gunshots and a loud slamming noise. Little walked away from her friend's house, saw Brown lying on the ground, and ran away.

3

¶ 11    Little testified that she ran to her aunt's house, and her aunt drove her to the house of Metlock's mother. Little entered the house at the same time as Metlock and saw Metlock's mother, father and sister. Metlock's mother was crying and Little told Metlock: "I don't think [Brown] made it." Metlock said that "he was sorry for what happened and that "he got rid" of the firearm. Later, Little went to the police station and provided a statement regarding the events.

¶ 12    A Chicago police detective went to the scene and observed an empty Cadillac crashed into a fence with the driver's seat door open. A Chicago police forensic investigator and his partner recovered blood from a nearby sidewalk, from the Cadillac's interior passenger's seat area and from the Cadillac's exterior driver's seat door.

¶ 13    Dr. J. Scott Denton, a deputy medical examiner at the Cook County Medical Examiner's Office, performed Brown's autopsy and found that Brown had a gunshot wound in her back with a bullet exit wound in her neck.  He also noted scrapes or abrasions on Brown's chin, left elbow, right knee and right ankle. Dr. Denton concluded that Brown's cause of death was the gunshot wound to her back and her manner of death was homicide.

¶ 14                        The State rested.

¶ 15    Metlock testified that on September 1, 2000, when he was in the vehicle with Brown, Clark and Little, that Little had a firearm in her waistband. When they reached the restaurant, Clark and Brown exited the vehicle to get food. Brown returned, opened the back door, and "tried to pat down" Little. When they left the restaurant, Little asked Brown to drop her off at a friend's house, and Metlock stated he "was going to get dropped back off" at his wife's house. Metlock denied that he told Brown where to drive, and he testified that they drove into an alley and Little told Brown to stop. Little then pulled the firearm from her waistband, set the firearm on the armrest between the driver's seat and the passenger's seat, and exited the vehicle.

4

¶ 16 According to Metlock, Clark asked Metlock about money that Metlock owed Brown and Clark. Metlock and Clark both reached for the firearm, and the two fought over it. The vehicle then "[took] off" and the firearm fired twice, though Metlock did not know who pulled the trigger.

¶ 17 Eventually, Metlock took the firearm and shot at Clark. When asked if he shot Brown, Metlock stated he "didn't even know [Brown] got shot." The vehicle crashed into a "tree or a fence." Metlock flew into the front seat, and Brown jumped out of the vehicle and ran. Metlock then also exited the vehicle and ran. Metlock testified that he did not have a firearm with him at the time.

¶ 18 The jury found Metlock guilty of first-degree murder, and found that during the commission of the offense, Metlock personally discharged a firearm that proximately caused Brown's death.

¶ 19                                    B. Sentencing

¶ 20 At the sentencing hearing on November 1, 2004, the State presented the victim impact statement of Brown's father. The circuit court was also presented with the presentence investigation report (PSI), which reflected that Metlock's birthday was November 3, 1979, making him 20 years old at the time of the offense on September 1, 2000. According to the PSI, in 1995 Metlock was placed on supervision in juvenile court after being charged with mob action. As an adult Metlock received two convictions of criminal trespass to vehicle and one conviction of criminal damage to property.

¶ 21 The PSI also stated that Metlock was the older of two children, and his parents never married but lived together "off and on for the majority of his life." Metlock denied ever being abused or neglected as a child and stated that he was " 'real close' " with his parents and sister. Metlock also stated that his father struggled with substance abuse, but no other immediate family members had substance abuse issues, and no one in his immediate family had a criminal background.

At the time the PSI was prepared, Metlock was living with his wife and two children, and two of his wife's other children from a previous relationship.

¶ 22    The PSI further stated that in the 11th grade, Metlock was "expelled for disciplinary reasons" and transferred to an "[a]lternative" high school for a short period before withdrawing from school altogether. He had no additional education but "expressed a desire to further his education in the accounting field." The PSI also reflected that Metlock had previously worked for a mortgage company and a bank for a few months each.

¶ 23    As to Metlock's health, the PSI stated that Metlock was in " 'pretty good' " health. Metlock reported that he had never been treated by a psychologist, psychiatrist, or mental health counselor. He denied having any issued with alcohol consumption but stated that he smoked cannabis daily and spent $50 a day on the substance. He also admitted he was under the influence of cannabis at the time of the offense. According to the PSI, Metlock also admitted he was a former member of the "Micki Cobras street gang" from the age of 10 or 11 until 1997 or 1998.

¶ 24    The defense argued before the circuit court that Metlock grew up with a mother "who cared for him and was there and continues to support him," but that Metlock's father was "addicted to various substances" and had "drug and alcohol problems." Due to his father's substance abuse, Metlock lacked "critical positive influence as a teenager, but still made an effort," which the defense argued was reflected by Metlock's marriage, family life and work history. The defense emphasized that Metlock had no prior felonies, that his past convictions were misdemeanors "of a nonviolent nature," and that Metlock "was doing [his] best to overcome his circumstances." According to the defense, Metlock "wasn't out causing problems and running the streets and acting wild." The defense acknowledged that "[t[he legislature has seen fit to make" 45 years the minimum sentence

Metlock could receive, but asserted that "the Court should have the discretion" to impose a sentence less than 45 years. There was no testimony in mitigation.

¶ 25    The sentencing court stated:

> "I have reviewed this defendant's presentence investigation, and I concur with [defendant's counsel], it is relatively unremarkable when you speak in terms of those who have criminal backgrounds. Well, [defendant's counsel] has already articulated and acknowledged the prior convictions in the degree of severity. The evidence against Mr. Metlock, I believe was overwhelming. Considering those matters properly before this Court as well as what I perceived to be defendant's potential of rehabilitation, which I believe is first and foremost in the sentencing formula, sir, you are sentenced to 50, 50, 50 years in the Illinois Department of Corrections."

¶ 26    The 50-year sentence was the combination of a discretionary sentence of 25 years for first degree murder and the statutory mandatory 25-year firearm enhancement.

¶ 27    Metlock filed a motion to reconsider, arguing that his sentence was excessive and that the firearms enhancement he received pursuant to 730 ILCS 5/5-8-1(d)(iii) (West 2000) violated the United States Constitution and the Illinois Constitution. The circuit court denied the motion, stating:

> "All right. The motion to reconsider this sentence is respectfully denied. I have
>
> listened attentively to the argument, particularly in mitigation, I have reviewed the presentence investigation, it is my opinion that the defendant's criminal background is of little consequences [*sic*] if any. The sentence imposed is based upon the testimony that was received by the jury in this court in this proceedings [*sic*] and as well as, again, I'm repeating myself, what I believed to be Mr. Metlock's potential for rehabilitation while being within the mandates of minimum sentence. The matter is off the call."

7

¶ 28    On direct appeal Metlock argued that (1) the circuit court erred in permitting the State to withdraw charges of knowing and intentional murder; (2) the circuit court failed to instruct the jury on self-defense and second-degree murder; (3) defense counsel was ineffective for not offering an instruction on attempted theft; (4) the State improperly used repetitious evidence of defendant's statements; and (5) the State made improper statements in closing arguments. We affirmed. *People v. Metlock*, No. 1-04-3268 (2004) (unpublished order under Illinois Supreme court Rule 23).

¶ 29                                C. First Postconviction Petition

¶ 30    In October, 2007, Metlock filed a post-conviction Petition, alleging *inter alia* that: (1) trial counsel was ineffective for failing to secure a speedy trail; (2) trial counsel was ineffective for failing to investigate or discover exculpatory evidence, present favorable testimony, and properly cross-examine witnesses; (3) trial counsel was ineffective for failing to request a jury instruction for attempt theft as a lesser included offense of attempt armed robbery and for failing to inform Metlock of the option to instruct the jury on attempt theft; (4) the State used "false" and "perjured testimony" from witnesses; (5) the charges were insufficient, where he was convicted of felony murder stemming from attempt armed robbery, but his indictment did not allege attempt armed robbery or identify a victim of the attempt armed robbery; and (6) counsel on direct appeal was ineffective for failing to raise the issues alleged in Metlock's postconviction petition. The petition proceeded to second-stage postconviction proceedings.

¶ 31    On October 22, 2009, the Public Defender of Cook County brought a supplemental petition on Metlock's behalf, adding that Metlock's counsel at trial and on direct appeal were ineffective for failing to raise the prosecutor's "completely made up" testimony during closing arguments.

¶ 32   On February 15, 2012, the circuit court dismissed Metlock's postconviction Petition. Then on March 13, 2012, Metlock filed a motion for reconsideration of the dismissal, which the circuit court denied on June 11, 2012.

¶ 33   Metlock appealed from the circuit court's dismissal of his post-conviction petition, alleging that he was entitled to an evidentiary hearing because he had made a substantial showing of ineffective assistance of counsel.   On October 22, 2014, this court affirmed the circuit court's decision. *People v. Metlock*, 2014 IL App (1st) 121874-U.

¶ 34                               D.  Section 2-1401 Petition

¶ 35   On May 23, 2016, Metlock submitted a *pro se* petition for relief from judgment pursuant to 735 ILCS 5/2-1401. *et. seq.*, (West 2016), alleging that "while working in the prison law library," he was able to research his case and "discovered that the prosecution, by making egregious statements of fact, actually committed fraud upon the court."  On July 1, 2016, the circuit Court denied the petition, finding that it was untimely as it was filed more than two years after the entry of judgment, and that the claim did not concern "facts unknown at the time of judgment."

¶ 36   Metlock filed a notice of appeal on July 22, 2016.  On May 18, 2018, this court entered an agreed order proposed by the parties remanding the case for further petition for relief of judgment proceedings.  *People v. Metlock*, No 1-16-2286 (1st District, 2018).  Metlock does not raise any issues regarding the 2-1401 Petition in this appeal.

¶ 37           E.  Motion for Leave to File a Successive Postconviction Petition

¶ 38   On October 25, 2016 Metlock filed a *pro se* "expedited" motion for leave to file a successive postconviction petition.  Metlock alleged that his sentence was a *de facto* life sentence which violates the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Metlock cited *People v. House,* which briefly mentions

that in Germany "all young adults 18-21 are tried in juvenile court and that Sweden allows for young adults to be tried in juvenile court until their twenty-fifth birthday and young adults 18-24 receive different treatment that adults." *People v. House*, 2019 IL App (1st) 110580-B. ¶ 56, appeal allowed, 125124, Jan. 29, 2020. Metlock argued that the requirements of *Miller v. Alabama*, 567 U.S 460 (2012) and *Montgomery v. Louisiana*, 136 S. Ct. 718, (2016), should have applied to him as a 20 year-old at the time of the offense. Therefore, according to Metlock, the circuit court should have considered his age and its attendant characteristics before imposing a *de facto* life sentence.

¶ 39    Metlock also attached his proposed successive postconviction petition, which included an affidavit by Metlock, that described Metlock's youth. The affidavit alleged that when he was nine years old, Metlock first saw someone murdered. Metlock alleged that "[t]he signs of violence eventually became a reality of everyday life, witnessing 'bodies stuffed    'in elevator shafts, people shot, stabbed, beaten, and abused to the point life didn't seem valuable." Metlock believed he "wouldn't live to see" the age of 18  because he as "shot at, stabbed and jumped on by gang members." When he was 12 years old, Metlock "had a .357 magnum put in [his] face" and was "pistol whipped" and hit in the back of the head.

¶ 40    Metlock also claimed that he "grew up in a drug infested home" with a father addicted to crack cocaine. Metlock could only eat once a day because his family did not have enough food and he was often "teased and picked on" by classmates at school for being poor and having parents who were "crak-heads" [*sic*]. At age 11, Metlock "started hanging out with the wrong crowd," who "started buying him clothes and food" and gave him "a false sense of security." At age 13, Metlock repeatedly ran away from home and was expelled from high school and was sent to an "alternative school" and dropped out shortly after. When he was 15 years old, Metlock entered a sexual relationship with a 23-year old woman, who "molested" and "manipulated" him. Eventually they

got married, and Metlock alleged, "she basically forced me to sell drugs to support us." Additionally, Metlock alleged that there was "no premeditation to [his] crime" as it "was the victim's gun that I tried to take out of his hand," and he believed the victim intended to shoot Metlock. Metlock then stated that since his imprisonment, he had "turned to God," "stopped getting into trouble," and too "extreme measures in this hostile environment" to "avoid" ever being that person***again." We note that information contained in Metlock's affidavit is significantly different than the information in the PSI that was available to the sentencing judge.

¶ 41 In addition to his own affidavit, the petition also contained letters submitted by Metlock's family members and acquaintances regarding Metlock's character and how much Metlock had changed while in prison. He also included his high school equivalency certificate, diplomas for college level microeconomics and integrated math, and multiple certificates for learning life skills and spiritual growth.

¶ 42 Metlock attached several "emerging adult" articles regarding brain development, including an article from the U.S. Department of Health and Human Services stating that the human brain "continues to mature well into the 20's," (see: Sara B Johnson, Robert W. Blum and Jay N. Gledd, *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, J. Adoles. Health, 2009 Sep. 45 (3): 216-221, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC 2892678), and one from the Juvenile Justice Initiative. The Juvenile Justice Initiative article noted that recent research has shown that people from 18 to 24 years old "are not yet fully mature adults. The young adult brain is still developing and young adults are in transition from adolescence to adulthood. Further, the ongoing development of their brains means they have a high capacity for reform and rehabilitation. Young adults are, neurologically and developmentally, closer to adolescents than they are to adults." See Kanako

Ishida, *Young Adults in Conflict with the Law: Opportunities for Diversion*, Dialogue, Education and Advocacy, February, 2015, https://jjustice.org/wp-content/uploads/young-adults-in-conflict-with-the-law-opportunities-for-diversion.pdf [https://perma.cc/69CY-SGF9].

¶ 43    On December 9, 2016 the circuit court denied Metlock leave to bring a successive postconviction petition. The circuit court reasoned that the standard set by *Miller* and *Montgomery* apply only to juveniles and then only to mandatory life sentences without the possibility of parole and in which the sentencing court did not take into consideration the offender's background; that Metlock's sentence was "not necessarily the functional equivalent of life," as it was "by no means unsurvivable;" that his sentence of 50-years was within the sentencing range for first-degree murder; and that while this court held in *House* that a life sentence for a 19-year old violated the proportionate penalties clause of the Illinois Constitution, the *House* ruling was based on the "unique facts of the case," as the defendant there was involved in the crime "as a lookout rather than an active participant."

¶ 44    On December 19, 2016 Metlock brought a *pro se* motion to reconsider the ruling. On January 19, 2017, Metlock filed a *pro se* "Supplemental Motion to Reconsider Citing Additional Authority" newly citing this court's decision in *People v. Harris*, 2016 IL App (1st) 141744 (affirmed in part, reversed in part, *People v. Harris*, 2018 IL 121932 (2018)), which was entered days after Metlock filed his original motion to reconsider. Metlock asserted that *Harris* supported his claim as it reaches a similar conclusion to *House* but concerned a defendant who was an "active shooter." On March 10, 2017, the court entered an order denying Metlock's supplemental motion to reconsider.

¶ 45    On March 31, 2017 Metlock filed a notice of appeal. Then on May 19, 2017, the circuit court entered another order denying Metlock's original motion to reconsider. On March 6, 2017, the Illinois Supreme court entered a supervisory order stating:

> "The Appellate Court, First District, is directed to treat the notice of appeal filed on March 31, 2017, and assigned appeal No. 1-17-0946 as a properly perfected appeal from the circuit court's December 9, 2016 judgment denying leave to file a successive post-conviction petition, the March 10, 2017 judgment denying movant's supplemental motion to reconsider citing additional authority, and the May 19, 2017 judgment denying movant's motion to reconsider in case No. 01 CR 2948." *People v. Metlock*, No 124587 (Ill. Mar. 6, 2019).

¶ 46    We now consider Metlock's appeal.

¶ 47                                II. ANALYSIS

¶ 48    On appeal Metlock argues that the circuit Court erred in denying his motion for leave to file a successive postconviction petition because his 50-year prison sentence violates the eighth amendment to the United States Constitution (U. S. Const., amend VIII) (" Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.") and the proportionate penalties clause of the Illinois Constitution (Ill. Const. , art 1, § 11). ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.")

¶ 49                     A. Successive Postconviction Petition

¶ 50    Under the Act (725 ILCS 5/122-1 *et seq*. (West 2016) a criminal defendant may "assert that his federal or state constitutional rights were substantially violated in his original trial or sentencing hearing." *People v. Davis*, 2014 IL 115595 ¶ 13. Proceedings on a post-conviction

petition "focus on constitutional claims that have not and could not have been previously adjudicated." *People v. Holman*, 2017 IL 120655, ¶ 25. Thus, issues that could have been raised previously but were not, are forfeited. *Id.*

¶ 51    A defendant faces "immense procedural default hurdles when bringing a successive postconviction petition" as "the Act contemplates the filing of only one postconviction petition." *Davis*, 2014 IL 115595, ¶ 14. Specifically, a defendant must establish cause and prejudice, which require a showing of the following:

"(1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial postconviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial postconviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2018).

¶ 52    The Illinois Supreme court has found that the substantive rule established in *Miller* satisfied cause and prejudice for purposes of the Act, as the "rule constitutes 'cause' because it was not available earlier to counsel [citation], and constitutes 'prejudice' because it retroactively applies to [the] defendant's sentencing hearing." *Davis*, 2014 IL 115595, ¶ 42. We review the denial of a defendant's motion for leave to file a successive post-conviction petition *de novo*. *People v. Bailey*, 2017 IL 121450 ¶ 13.

¶ 53                              B. *Miller v. Alabama*
                                 567 U.S. 460 (2012)

¶ 54    The United States Supreme court in *Miller* held that the eighth amendment to the United States Constitution forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. *Miller*, 567 U.S. at 470. The Court reasoned that "children are constitutionally different from adults for purposes of

14

sentencing" as (1) children "have a lack of maturity and an underdeveloped sense of responsibility"; (2) children "are more vulnerable ***to negative influences and outside pressures"; and (3) "a child's character is not as well formed as an adult's," "his traits are less fixed," and "his actions [are] less likely to be evidence of irretrievabl[e] deprav[ity]." (Internal quotation marks omitted,) *Id.* at 471. Sentencing a juvenile to mandatory life without parole precludes consideration of the juvenile's age and its attendant characteristics. *Id.* at 477. "[A] judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489.

¶ 55     The Illinois Supreme court has summarized these "attendant characteristics" as including the following:

"(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant' prospects for rehabilitation." *People v. Holman,* 2017 IL 120655, ¶ 46.

¶ 56     Our Supreme court has extended *Miller* requirements to discretionary life sentences without parole for juvenile homicide defendants (*Id.* ¶ 40), as well as to *de facto* life sentences imposed on juveniles, which the Court defined as sentences more than 40 years in prison. *People v. Buffer,* 2019 IL 122327 ¶ 41. Whether a sentence is constitutional is a question of law, which we review *de novo. People v. Taylor,* 2015 IL 117267 ¶ 11.

¶ 57                          *Miller* Protection
                    Under the Eighth Amendment

15

¶ 58    Metlock does not dispute that he was 20 years old at the time of the offense. As our supreme court has held: "for sentencing purposes, the age of 18 marks the present line between juveniles and adults." *People v. Harris*, 2018 IL 121932, ¶ 61. Accordingly, for the purposes of this analysis, we observe that Metlock was not a juvenile when he committed the offense but was, rather, an emerging adult. As such, he cannot claim *Miller* protections under the eighth amendment to the U.S. Constitution.

¶ 59    Accordingly, we affirm the circuit court's denial of Metlock's motion to file a successive postconviction petition as to Metlock's eighth amendment claim.

¶ 60                    *Miller* protections under the Proportionate Penalties
                        Clause of the Illinois Constitution

¶ 61    Metlock also claims that his sentence was unconstitutional as applied to him because the circuit court failed to consider his age and attendant characteristics when imposing his 50-year sentence. Metlock seeks to extend the reasoning in *Miller* to apply to him as an emerging adult under the proportionate penalties clause of the Illinois Constitution. "An as-applied challenge requires a showing that the statue is unconstitutional as it applies to the challenging party's specific circumstances." *Harris*, ¶ 52

¶ 62    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. art. 1, § 11. A sentence is unconstitutional under the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). Our supreme court has found that the "limitation on penalties"

in this clause goes "beyond the framers' understanding of the eighth amendment and is not synonymous with that provision." *People v Clemons*, 2012 IL 107821 ¶ 40.

¶ 63    In *Harris* the supreme court held that a defendant who was 18 years old at the time of his offense could not challenge his sentence for failure to comply with *Miller* based on the eighth amendment. *Harris,* 2018 IL 121932, ¶ 61. The *Harris* Court acknowledged that "[b]because defendant was an adult *Miller* does not apply directly to his circumstances," and noted that "[t]he record must be developed sufficiently to address defendant's claim that *Miller* applied to his particular circumstances." *Id.* ¶ 45. Therefore, the defendant's as-applied challenge to his sentence was premature, and a reviewing court could not have ruled on the merits of the issue. *Id.* ¶ 46.

¶ 64    We recognize a growing body of research has shown that the human brain may not reach full development until well into a person's 20's, challenging "longstanding assumptions that the brain was largely finished maturing by puberty." Sara B. Johnson Pd.D., M.P. H. *et. al., Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent HealthPolicy,* 45 (3) J. Adolesc. Health, 216-21, (2009), https://www.ncbi.nlm.hih.gov/pmx/articles/PMC2892678/. For instance, "it is not until a person's early 20's or later that certain developments occur in the prefrontal cortex, which coordinates a set of supervisory cognitive skills needed for goal-directed behavior, including planning, response inhibition, working memory and attention." *Id.* Emerging adults have been found to be "more similar to adolescents than fully mature adults. They are more susceptive to peer pressure, less future-oriented and more volatile in emotionally charged settings." Vincent Schiraldi & Bruce Westerns, *Why 21 Year-Old Offenders Should be Tried in Family Court,* Wash. Post (Oct. 2, 2015), https://www.washingtonpost.com/opinions/time-to-raise-the-juvenile-age

limit/2015/10/02/948e317c-6862-11e5-9ef3-fde1882507eac_story.html. [https://perma.cc/FV36-XURC].

¶ 65 A study from Columbia University observed: "there is mounting scientific evidence that youth ages 18-24 are developmentally distinct from older adults and should be treated as such by the justice system***Research shows that there is no magic birthday that transforms a youth into an adult and the transition period is longer that previously understood." Selen Siringil Perker, Lael H. Chester and Vincent Schiraldi, *Emerging Adult Justice in Illinois: Toward an Age-Appropriate Approach*, Columbia University Justice Lab, Jan. 24, 2019, at 2, https://jjusticelab.columbia.edu/Emerging-Adult-Justice-in-Illinois#/:~:text=Emerging%20Adult%20Justice%20in%2025. Such evidence is significant considering that, "in Illinois, emerging adults comprise 10% of the overall population in 2013 [in adult prisons] yet they account for 34% of total arrests." *Id.* at 5.

¶ 66 The Illinois Supreme court has yet to weigh in on exactly how courts should treat emerging adult defendants who claim *Miller* protection under the proportionate penalties pause of the Illinois Constitution. We find that a proportionate penalties claim such as the one brought by Metlock must be handled on a case-by-case basis.

¶ 67 "Our supreme court has found that the proper vehicle for a young adult such as defendant, who is between 18 and 21 years old, to raise as as-applied challenge to a claimed *de facto* life sentence is in a postconviction proceeding." *People v. Minniefield*, 2020 IL App (1st) 170541 ¶ 43. Further, "our supreme court has found that, in general, 'a reviewing court is not capable of making as as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Harris*, 2018 IL 121932, ¶ 41.

¶ 68    We note that a recent Michigan study shows that the natural life expectancy for adults incarcerated for natural life is 58.1 years but for juveniles it is only 50.6 years. Deborah LaBelle, *Michigan Life Expectancy Data for Youth Serving Natural Life Sentences,* http://www.167.uscourts.gov/documents/17-12441 pdf.

¶ 69    Under the statutes in effect when Metlock was sentenced he is required to serve his entire sentence, or 100%. Metlock was 20 when he committed this crime, was 24 when he was sentenced, and he was sentenced to 50 years in the Illinois Department of Corrections. He will be 74 when he is released, well past the 58.1 year life expectancy discussed in the Michigan study.

¶ 70    Our progress in understanding the human brain's development has, to some extent, not been lost on the legislature. It passed Public Act 101-288, which, in part, provides parole review for homicide defendants who were under the age of 21 at the time of the offense and sentenced on or after June 1, 2019. 730 ILCS 5/5-4.5-115(b). This new legislation reflects a growing appreciation in Illinois that our informed treatment of youth in the criminal justice system should not stop at age 18.

¶ 71    And, while this legislation is part of the solution, it is also part of the problem. The Legislature decided not to make the amendment retroactive, and that has caused a wide disparity between those defendants who committed first degree murder while between the ages of 18-21 and who were sentenced before June 1, 2019 and those who were sentenced for the exact same crime after June 1, 2019.

¶ 72    During debate on the Senate floor, Sen. Harmon specifically stated: "this is prospective only. It will not disturb any victims who are --- whose offenders have already been imprisoned." *State of Illinois, 100ᵗʰ General Assembly, Regular Session, Transcript, 5/31/2017, p 36.* This was in response to push-back by colleagues who argued against inserting parole hearings into long

sentences for already-convicted homicide defendants who were between the ages of 18-21 at the time of the offense. The opposition was based primarily on the impact on victims' families having to face offenders at a parole hearing when they, the loved ones, had been led to believe that parole hearings in such cases were statutorily not possible because of earlier "tough on crime" legislation.

¶ 73 Sen. Harmon argued that "the science of brain development suggests that young people don't reach the age of fully formed brains at eighteen or twenty-one. It's not until the mid-twenties. There is no judge on the planet who can look at a nineteen year old and say, I know for a fact that you're the kind of young person who is going to mature and rehabilitate in prison or you're the kind who is never going to get out of prison that's why we create this parole process so that ten years or fifteen years down the road, we can have a second look at the offender and say whether it's appropriate for them to be release," *Id.* p 36.

¶ 74 Then-Senator Raoul added: "We ought to empower the Prisoner Review Board…to use their discretion to evaluate individual circumstances…We ought to recognize a message that the Supreme Court of these United States of America sent us to say that we evaluate these offenders who may have committed a crime when they were very young and who have spent a considerable amount of time in the Department of Corrections and make a decision based on each individual case, and not doing so is unjust." *Id.* p. 35.

¶ 75 That the legislature chose a starting date for this bill to take effect, that is, sentences handed down on or after June 1, 2019, demonstrates a legislative compromise in order to get the legislation passed on the last day of session in 2017. The courts, however, are under no such compromise-driven constraint. When overlapping the brain development science available today with the sentencing and parole system in Illinois we can see no rational or justifiable reason to make a parole hearing available after twenty years to a first degree murder defendant who committed the crime

while under the age of 21 and who was sentenced before June 1, 2019, but not available to a first degree murder defendant who was under the age of 21 at the time of the offense who was sentenced after June 1, 2019. The same characteristics and potential for rehabilitation are as likely in any defendant less than 21 years of age at the time of the offense whether it was committed 3 years ago or 20 years ago.

¶ 76    Make no mistake. The victims of these horrible crimes are no less a concern to the courts than to the legislature. However, there is nothing that suggests that the Prisoner Review Board will be anything but diligent in exercising its authority and reviewing each case and each individual on its own merits.

¶ 77    Furthermore, rehabilitation has been the cornerstone of our criminal justice system in Illinois since 1869 when the Commissioners of the Penitentiary were directed to provide "diminution of sentence if no infractions of the discipline" occurred with reductions in sentence for good conduct. The prisoner could then be granted a certificate of "restoration." Today the Unified Code of Corrections defines the responsibility of the Department of Corrections as: "to accept persons committed to it by the courts of this State for care, custody, treatment *and rehabilitation.*" (Emphasis added.) 730 ILCS 5/3-2-2(1)(a) (West 2016)

¶ 78    Metlock has shown, and we agree, that he should be able to develop a record to demonstrate to the trial court that the well-respected sentencing judge did not take into consideration the *Miller* factors, because those factors were not part of our jurisprudence until well after his sentencing; that his sentence is a *de facto* life sentence; that he was an emerging adult when the crime was committed; and that his sentence therefore violates the proportionate penalties clause of the Illinois Constitution.

¶ 79    We find that the only way to resolve these issues is to allow the petitioner to file his successive postconviction petition so that he can develop the record.

¶ 80    We recognize that there is split in our appellate courts about how to handle as-applied proportionate penalties challenges to sentences imposed on emerging adult homicide defendants when presented in the context of successive postconviction petitions.

¶ 81    On the one hand some of our appellate courts have held that the circumstances of the individual defendant and the crime should determine the result in successive post- conviction petitions. Those cases have considered whether (1) the offender was an active participant in the offense; (2) if the sentence was discretionary or mandatory; (3) if the sentencing judge considered his or her youth and rehabilitative potential; (4) whether the successive postconviction petition alleged or failed to allege facts demonstrating how individual characteristics showed how the petitioner's brain was more like a juvenile's than an adult's. See, e.g., *People v. Carrion*, 2020 IL App (1st) 17001, ¶¶ 30-33[1]; *People v. Gomez*, 2020 Il App (1st) 173016, ¶¶ 37-38; *People v. McClurkin*, 2020 IL App (1st) 171274, ¶¶ 20-23; *People v. Handy*, 2019 IL App (1st) 170213, ¶¶ 40-41; *People v. Moore*, 2020 IL App (4th) 190528, ¶¶ 38-41; *People v. White*, 2020 Il App (5th) 170345, ¶ 31; *People v. Ramsey*, 2019 IL App (3rd) 160759, ¶¶ 22-23.

¶ 82    On the other hand, some courts have held that successive postconviction petitions by emerging adults under the proportionate penalties clause should be allowed, regardless of whether the offender was an active participant or not, and regardless of whether the sentence was

---

1 We note that both of the justices in the majority concurred in *People v. Carrion* which denied a 19 year old homicide defendant leave to file a successive postconviction petition. *Carrion* is distinguishable because we found that, there, the sentencing judge did take into consideration the *Miller* factors. Here we can make no such finding without further development of the record.

discretionary or mandatory. See e.g., *People v. Franklin*, 2020 IL App (1st) 171628, ¶¶ 68-69; *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 2,34; *People v. Ruiz*, 2020 IL App (1st) 163145, ¶¶ 1, 38-40; *People v. Johnson*, 2020 IL App (1st) 171362, ¶¶ 1-2, 15-16; *People v. Carrasquillo*, 2020 IL App(1st) 180534, ¶ 109; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 47; *People v Bland*, 2020 IL App (3rd) 170705, ¶ 14. These decisions found that it was premature to dismiss proportionate penalties challenges before the petitioners could fully develop the record necessary to support their claims. Here the "defendant has shown prejudice by establishing a catch-22 – without a developed record he cannot show his constitutional claim has merit, and without a meritorious claim he cannot proceed to develop a record." *Minniefield*, at ¶ 44, (quoting *Carrasquillo*, at ¶ 109). We agree with the later line of cases.

¶ 83    For the reasons articulated above, the decision of the circuit court to deny Metlock's petition to file a successive postconviction petition is reversed and this matter is remanded to the circuit court.

¶ 84    Reversed and remanded.

¶ 85    JUSTICE LAVIN, dissenting:

¶ 86    I respectfully dissent. Courts generally decline to overrule the legislature's exercise of its broad discretion in setting a criminal penalty unless a penalty clearly exceeds constitutional limitations. *People v. Coty*, 2020 IL 123972, ¶ 43. Additionally, the proportionate penalties clause does not require the legislature to give an offender's rehabilitative potential greater weight than the seriousness of the offense. *Id.* ¶ 24. While defendant was only 20 years old at the time of the offense, his discretionary 50-year sentence does not shock the conscience where he shot two people, killing one.

¶ 87    To the extent that the *Miller's* concerns about youth even apply to this defendant, the record reflects that the trial court had ample information before it to consider the *Miller* factors before imposing a sentence. See *People v. Lusby*, 2020 IL 124046, ¶ 33, n.2 (recognizing that no "magic words" are required to satisfy *Miller*); *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 33 (finding that even if the "defendant could establish that *Miller* principles extended to him, where he committed the murder at the still youthful age of 19, the record before us demonstrates that his sentencing hearing was *Miller* compliant").

¶ 88    This is not an instance where the court made findings contrary to *Miller*. Nor is this a case where the minimum sentence authorized by statute hindered the court's exercise of discretion. The court could have imposed a lesser sentence but, in its discretion, found that a lesser sentence was not warranted. Moreover, defendant's sentence was a mere five years above the minimum. This is because the court did consider defendant's age and his "relatively unremarkable" criminal history. *People v. Thompson*, 2021 IL App (1st) 180297-U, ¶¶ 7, 17-35 (finding the 19-year-old defendant's cumulative, discretionary sentence of 60 years in prison for first-degree murder and attempted first-degree murder did not violate the proportionate penalties No. 1-17-0946 clause, notwithstanding the defendant's insignificant criminal record, where the sentence "reflect[ed] his personal involvement in a shooting he committed as an adult" and did not involve a mandatory sentence that frustrated the trial court's discretion, and the sentencing hearing complied with *Miller*).

¶ 89    Defendant cannot show, even at this stage under the Act, that his sentence, or the proceeding that led to it, even arguably violated the proportionate penalties clause. I would affirm the circuit court's judgment.